L. C. SNEARLY, Appellant, v. WILTON MCCARTHY, Appellee.

**NEGLIGENCE:** Pleading—Enumerating Grounds of Negligence—
1, 4 **Effect.**   One who enumerates specific grounds of negligence must stand or fall thereon.   So held where, in an action for malpractice, plaintiff alleged specifically wherein defendant was negligent, and was properly refused the right to show negligence in not giving "constitutional" treatment, because such negligence was not pleaded.

**PHYSICIANS AND SURGEONS:** Malpractice—Inference from Re-
2 sults of Treatment—Expert Testimony.   A jury may not draw the conclusion of unskillfulness solely from proof of the result of the treatment (except perhaps in rare cases of exceptional and gross negligence).   In other words, plaintiff may not stop at showing the *treatment* and the *results*, and then have the jury turned loose to set up their own standard as nonexperts as to what is and what is not proper and reasonable method of treatment.   *The only recognized standard is essentially within the domain of expert testimony.*

**PHYSICIANS AND SURGEONS:** Malpractice—Essentials of Re-
3 covery.   In an action for malpractice, it is essential to show:
1. The treatment or lack of treatment.
2. That such treatment or lack of treatment is not regarded

as proper *by those skilled in the profession of medicine or surgery.*

3. That injury resulted as the proximate result of such treatment or lack of treatment.

Evidence reviewed in the case of the reduction of a fractured limb, resulting in long delayed union and shortening of the limb, and held insufficient to establish said essentials.

**NEGLIGENCE:** Pleading—Enumerating Grounds of Negligence—1, 4 Effect.

**EVIDENCE:** Relevancy, Materiality and Competency—Similar Transactions—Malpractice. On the issue whether long delayed union of a broken limb was the result of negligent treatment, evidence is inadmissible that plaintiff, some years prior, had suffered a dissimilar fracture which readily united.

*Appeal from Polk District Court.*—W. S. AYRES, Judge.

SATURDAY, JANUARY 20, 1917.

REHEARING DENIED TUESDAY, MAY 22, 1917.

ACTION against defendant, who is a physician and surgeon, for malpractice in reducing a fracture to the femur of plaintiff's right leg. The defendant denied all negligence in the treatment of the case. On the issues joined, the case was tried to a jury, and, at the conclusion of the testimony offered for plaintiff, the trial court, on motion, directed a verdict for defendant, and plaintiff appeals.—*Affirmed.*

*A. D. Pugh,* for appellant.

*Dutcher, Davis & Hambrecht,* and *Parsons & Mills,* for appellee.

DEEMER, J.—I. On April 22, 1912, plaintiff, while riding a motorcycle in the city of Des Moines, collided with an automobile, resulting in a simple oblique fracture of the femur of his right leg. He was immediately taken to one of the hospitals in the city, and a Dr. Losh was called. Plaintiff had a brother in the city who had at one time

practiced medicine and surgery, and he, too, was called. The two doctors, upon consultation, agreed to call the defendant, and he responded to the call. Plaintiff was immediately taken to the operating room of the hospital, and an anesthetic was administered, the fracture reduced, and the patient taken back to his room. While still under the influence of the anesthetic, dressings and sandbags and extension straps were applied. Within twelve hours, weights were added, and these were followed by splints, and matters apparently progressed as usual for two or three weeks, when plaintiff discovered, or thought he discovered, a shortening of the injured limb. He called his brother's attention to the matter, and the latter measured it and found it to be almost two inches shorter than the other one. During the interim, plaintiff was visited every day or so by four other physicians aside from defendant, although but one of these seemed to have charge of the case—that one being an interne at the hospital or an assistant to the defendant.

Defendant was informed of the shortage, visited the plaintiff, and prescribed additional weight to the extension, which was then added. After being in bed five or six weeks, plaintiff was allowed to sit in a chair for about two weeks, and then to get around on crutches for about three weeks. Before this, however, Dr. Losh put on what is called an ambulatory splint, for the purpose of adding to the extension. After that, a plaster of Paris cast was put on, and this extended from just below the hip to a point just below the knee. At the end of seven weeks, and while the cast was still on, Dr. Losh and the defendant concluded that plaintiff might leave the hospital, and he did so leave. The doctors told him that he might by degrees bear some weight upon the injured member. Some of the cast was cut away, so as to free the action of the knee joint. In observing the directions of the physicians, plaintiff noticed some trouble with the injured leg, as if the bones were

slipping past each other, and reported the same to Dr. Losh, and also called Dr. Welpton's attention to the matter. Dr. Losh had plaintiff taken to another hospital, and there some X-ray pictures were taken. Dr. Welpton and a Dr. Habenicht also took some pictures. Thereupon, plaintiff called defendant's attention to the matter, and defendant, upon examination, found that there had been no union of the fractured parts. Such being the situation, defendant recommended an operation, and the use of what is known as a Lane plate. Accordingly, plaintiff was again taken to a hospital, the leg was cut open, the bones scraped, and the plate applied. The wound was left open and the limb bandaged and dressings changed daily thereafter for several weeks, when another plaster cast was put upon the limb, this cast extending the full length of the leg. This remained on for about six weeks. At that time, a shorter cast was put on, which remained for several weeks, and then what is known as a cylinder cast was applied, and this was left on until plaintiff left the hospital, about December 17, 1912. He left because he saw no signs of improvement. Before leaving the hospital, and while defendant was still treating him, plaintiff's brother, the doctor, called a doctor friend from Chicago to see the patient, and this doctor recommended that plaintiff be taken to Chicago for future surgical work. Upon leaving the hospital in December, plaintiff went to Chicago and consulted Dr. John B. Murphy. Murphy had an X-ray taken, and concluded therefrom that another operation was necessary. This was performed, another plate was put on, and also what is known as a travoid splint. Four months afterward, Dr. Murphy discovered that there was still no union. Another operation was then had, and a plaster of Paris cast was put on, extending from the waist line to the toes. About four and a half months after this second operation, it was discovered that there was still no union, and, on September 5,

1913, a third operation was performed by Dr. Murphy, which resulted in a union, and plaintiff was finally discharged about January 14, 1914. Plaintiff's injured limb is now considerably reduced in size, and is about one and a half inches shorter than the other one.

Many grounds of negligence are charged, and these are made quite specific. As we gather from the petition, it is claimed that defendant was negligent in not using an X-ray machine in diagnosing the case before he did anything toward reducing the fracture; negligent in not using it both before and after he performed the operation; that he was negligent in not properly bandaging the limb and applying splints and methods for extension before plaintiff came out from under the influence of the anesthetic given just after he received his injuries; that defendant was negligent in failing to discover the shortening of plaintiff's limb and the nonunion of the bone, and applying proper methods to correct the difficulty; that proper extension was not applied at a suitable time or times, and that the application of splints, bandages and supports was negligently delayed and applied when the limb was swollen, and when the inflammation subsided, they were not sufficient to reduce the fracture or to hold the bones in apposition; that the Lane plate was not properly put on, in that it did not have a sufficient number of screws, was not put on straight or sufficiently secured to hold the broken bones in place; that the delayed union was due to defendant's failure to properly hold the broken bones in apposition so that they might reunite, or to constitutional causes which were preventable; and that defendant did nothing to remove these conditions.

It is claimed that in all these respects defendant failed to follow the usual and customary practice of physicians and surgeons in his locality, both in the diagnosis and treatment of the case.

On the other hand, defendant insists that there is no

testimony whatever that he did not treat the plaintiff according to the usual and proper methods; that there was no evidence of any neglect on his part, either in discovering or treating the injuries; and that the difficulties with plaintiff's case arose out of the fact that there was a nonunion of the bones, due to no fault of his, but to nature's failure to throw out the necessary material to unite the broken bones.

For appellee, it is insisted that plaintiff produced no testimony tending to show any malpractice on his part; that the testimony shows nothing but the fact of nonunion for an unusual length of time and a shortening and a reduction in the size of the injured limb, all of which is accounted for by natural causes, or unusual ones, for which defendant was in no manner responsible.

At the outset of the discussion, we may say that plaintiff selected the grounds of negligence upon which he would stand, stating them with great particularity, and that nowhere does he claim that defendant failed to give plaintiff the necessary constitutional treatment to aid nature in throwing out the callous or bony substance which cements the ends of broken bones together; so that this proposition must be eliminated from the case.

Again, while the method of treatment adopted by defendant is fully pointed out and described in the testimony, no witness was called by plaintiff to show that this was not regarded as proper practice by the profession in the locality where defendant practiced. If there be any such testimony, it is to be inferred from what defendant did or failed to do, viewed from the standpoint of a nonexpert, or deduced from what some of the medical experts said while on the stand. As a general rule, it may be safely affirmed that, in matters requiring special skill and

1. NEGLIGENCE: pleading: enumerating grounds of negligence: effect.

2. PHYSICIANS AND SURGEONS: malpractice: inference from results of treatment: expert testimony.

training, it is not permissible for laymen as nonexperts to set up any artificial standards as to methods of treatment. This is especially true in surgery; for in that field neither courts nor juries are presumed to know more regarding methods of treatment than ordinary laymen, and that is practically nothing.    After hearing the theories, deductions and scientific facts from experts, both judge and jury must often oppose one set of opinions against another and determine which is the more reasonable, but they cannot, without some guide, presume to fix any standard upon which to determine the correctness of any kind of treatment.    This is pointed out in many cases from other jurisdictions. *Ewing v. Goode,* 78 Fed. 442; *Getchell v. Hill,* 21 Minn. 464; *Tefft v. Wilcox,* 6 Kans. 46; *Farrell v. Haze,* (Mich.) 122 N. W. 197.    We have adhered to that doctrine in *Morrow v. National Mas. Acc. Assn.,* 125 Iowa 633.

In *Pettigrew v. Lewis,* 46 Kans. 78, the Supreme Court of that state said:

"To maintain her action, the plaintiff should have offered the evidence of skilled witnesses to show that the present condition of her eyes was the result of the operation, and that it was unskillfully and negligently performed. 'This evidence must, from the very nature of the case, come from experts, as other witnesses are not competent to give it, nor are juries supposed to be conversant with what is peculiar with the science and practice of the professions of medicine and surgery to that degree which will enable them to dispense with all explanations.' *Tefft v. Wilcox,* supra. 'The question whether a surgical operation has been unskillfully performed or not is one of science, and is to be determined by the testimony of skillful surgeons as to their opinion, founded either wholly on an examination of the part operated upon, or partly on such examination and partly on information derived from the patient; or partly on such examination, partly on such information, and part-

ly on facts conceded or proved at the trial.' * * * It would have been easy for the patient to have submitted to an examination by an experienced physician or oculist capable of determining whether the condition of her eyes was the result of the operation, and whether that operation was performed with reasonable skill and care. Cases may arise where there is such gross negligence and want of skill in performing an operation as to dispense with the testimony of professional witnesses, but not so in the present case."

**3. PHYSICIANS AND SURGEONS: malpractice: essentials of recovery.** Going back to the facts as disclosed by the record: While it is claimed that defendant was negligent in not using the X-ray before he did anything toward reducing the fracture, the testimony shows that it is entirely optional with physicians and surgeons whether to use the X-ray or not in the first instance. The purpose, of course, in using the X-ray is to diagnose the case, and if this may properly be done without the use of this modern appliance, then no negligence is to be inferred from failure to use one. Moreover, the record here shows that the nature, of the fracture was discovered when defendant was first called; hence an X-ray examination would have added nothing.

The immediate administration of an anesthetic is not complained of, but suggestion is made that the limb was not properly bandaged and supported before the patient came out from under the influence thereof, and extension was not provided until about twelve hours after the injury. These are almost wholly scientific surgical questions, upon which we have little or no light from the testimony. Such as we do have indicates that proper bandages and sandbags were used, and that it is not unusual to delay the use of the extension for a longer time than defendant did in this case. The same may be said regarding the use of

splints and other permanent bandages, depending upon the amount of inflammation and swelling, the condition of the patient's mind, etc.

Plaintiff was visited by many physicians before the shortening of the limb was discovered, and none of these say they observed anything wrong. It may be that the shortening should have been discovered by defendant, or his assistant, before it was; but when it was discovered, which was within two weeks, there is no claim that the added weight put upon the extension was not the proper treatment. There is no testimony to the effect that it was proper or usual at such a time to use an X-ray to discover whether the bones were then in apposition. The use of the plaster casts is not complained of, and no suggestion is made in argument that, before applying the casts, a skiagraph should have been taken. As we understand the record, skillful treatment of a fracture during the first few weeks demands that the injured member be handled as little as possible. Down until expiration of the usual period for a fracture to knit, there is no suggestion of any improper treatment, and nothing to indicate any trouble, save the shortening of the limb, and that was sought to be corrected by the usual methods. After the discovery of nonunion of the bones, and after plaintiff was instructed to bear some weight upon the limb, skiagraphs were taken under the direction of two doctors, but it does not appear that defendant had any taken. Whether he was advised of the results shown by those made under the direction of the other doctors does not appear; but it is agreed by all that there was a nonunion of the bones after six weeks and more of treatment, and it is practically agreed that the skiagraph would have shown nothing more, save the presence, perhaps, of something between the broken ends which prevented nature from doing her work. But this seems to have been immaterial, because, whatever the immediate

cause, it is not shown to have .been due to any fault of defendant, and all agree that an operation was necessary, and that the kind of operation which defendant undertook to perform at that time was the one demanded. The use of the Lane plate is not complained of, but it is said the defendant was negligent, in applying it: First, because he did not use enough screws; and, second, because it was not put on straight. The only testimony in support of either contention comes from plaintiff's brother, who, it seems, witnessed the operation, and from the skiagraph taken under the direction of Dr. Murphy at Chicago, some months afterwards. As to the latter, taken about December 17, 1912. it shows that the bones were not in apposition, and that the plate had either been improperly put on in the first instance, or had been forced out of position after being properly attached to the bones. We here reproduce this skiagraph, in order that the situation may be better understood.

Of course, it is not necessarily to be inferred from this that the plate was not properly put on in the first instance, but it may be considered as bearing upon that proposition. The direct testimony from the plaintiff's brother with reference to this was substantially as follows:

"I was present at the operation. Dr. McCarthy performed it, assisted by the interne—I think it was Dr. Martin. He was put on the operating table, and given an anesthetic, and the right thigh on the outer surface cut down 9 or 10 inches to the bone, and the parts of the bone were denuded, and one of the ends was cut off probably a half an inch, and an attempt was made to bring the two denuded ends together by means of screws and a Lane plate, and the wound was closed and he was put back to bed. It was a pretty bloody operation. From where I stood, I could not accurately describe the steps of the operation, but from what I could see, there was quite a quantity of

callous scraped away by Dr. McCarthy about the bone ends. Before the operation, when they cut down on the exposed bone, the lower fragment was on top of the upper fragment. By upper fragment, I mean that next to the body; that part was on top of the lower fragment, lapping, I should judge, a half or three quarters of an inch, and I do not think the broken surfaces were together. Dr. McCarthy first attempted to grasp and bring the fragments into position and hold them there by ordinary heavy forceps, but it kept slipping off for him, and he finally used his hands to hold them in position as near as he could until he could drill the holes and put on the plate. It was simply a single clamp forceps. As I understand, there is some appliance especially made for that purpose. It has a clamp for each bone end held rigidly together. The purpose of that is to secure the different parts of the bone while the plate is being made substantial. It holds them firm. That appliance was not used by Dr. McCarthy in this case. After the plate was attached, the position of the fragments would be pretty hard to say, because there was so much blood and tissue in the wound, but I recollect that it looked to me like the plate wasn't on good, wasn't on straight. The bones were not straight, as I remember it, and I thought to myself that they didn't look very good; but he had already slept an hour and forty minutes, and there wasn't much else to do but let him go."

As this witness' testimony was practically all having any bearing upon the alleged negligence of the defendant, we deem it our duty to set forth some of his cross-examination:

"The incision was something like 9 or 10 inches long, and to the bone, and the lips of the wound are spread apart. I stood on the right side of the table and about 6 or 8 feet away, during most of the operation. I was not right up to the table at any time. Did not get nearer than 3 or 4

feet from the table. The surgeon and his assistant stood on the same side of the table. The nurses stood around there where they were needed. The doctor was working down in the leg an inch and a half or two inches deep, and the wound was spread 4 or 5 inches apart by retractors, and the bone at the bottom and the blood was sponged out every second or two with gauze sponges. I think there were no splints or bandages on the limb after they began to give him the anesthetic. I did not see the cast taken off. He was lifted from the cart to the operating table. The cast was not on when they operated. I don't know whether it was taken off before or after the anesthetic was given. The sponges were thrown in a receptacle, some of them. The part of the bone was scraped and curetted away. I suppose I was 5 or 6 feet from the wound some of the time. It was covered with blood most of the time, or part of the time. I never at any time went over to this wound and examined it or looked in it. All I know is what I observed in standing 5 or 6 feet away. I had a perfect view. The operating table was about 3½ feet high and level, and the patient was rolled over slightly to the left and sandbags put under limb and hip, and patient's head was to the north, and I was on the right side of the table. The operator stood or sat on the right side of the table. He did not stand all the time; part of the time he sat. I was on the same side of the table behind the operator, and 5 or 6 feet from the wound. The operator's body did not extend above the top of the table and cover the patient. I may have the distance wrong there. I don't know how high the table or stool was. As I remember it, I could see over his shoulder. That is all I remember. The wound did not open in the opposite direction from me. It was not tipped that much, or the doctor could not have operated. The incision was made on the outside of the limb, the long way of the

limb. There is always more or less danger to a patient
who is under an anesthetic, and the longer the time, the
worse; so the surgeon should release the patient and get
him out from under it as soon as he can."

No other witness speaks of anything unusual or out
of the ordinary in defendant's treatment, save that there is
a suggestion that, early in the treatment, plaintiff's limb
should have had some kind of support on the bottom. Re-
curring again to the operation performed by defendant, no
one of the many doctors examined as witnesses pretended
to say that, from the radiograph or skiagraph, taken in
Chicago, the one which we have reproduced in this opinion,
any conclusion could be drawn as to how the defendant
applied or left the Lane plate when he operated. It ap-
pears that some of the screw holes were not filled, and the
inference is that but four were used, two at each end, and
that, as there were four holes in each end of the plate, four
should have been used. But it is generally agreed by the
experts that but two in each end were necessary. There is
also some testimony to the effect that one or both bones
had decayed to some extent, and that this accounts for the
plate's not holding. Under the testimony, we are com-
pelled to eliminate this skiagraph as inconclusive testi-
mony in the case. As already indicated, no testimony was
taken for defendant, and, while plaintiff had many doctors
on the stand, none of them was asked by him to say
whether or not the treatment given the fracture was ac-
cording to the usual and customary methods of physicians
and surgeons at the time it was given, in the locality where
defendant practiced. We can readily understand how, with-
out the aid of expert testimony, both court and jury might
find that the Lane plate was not properly applied. Its
purpose and objects being understood, and the operation
being almost entirely mechanical, we can easily under-
stand that, if the plate was originally applied as it shows

in the skiagraph attached, it would indicate negligence on
the part of the operator.  But, aside from the testimony of
the plaintiff's brother, which we have hitherto set out, there
is nothing whatever to show that the plate was not prop-
erly applied, save that there was no proper union of the
fractured bone.  Here, again, the experts agree that often
there is nonunion through no fault of the operator.  Again,
it is in the record that there may be nonunion for a year
or two without anyone's being at fault, and that thereafter
nature reasserts itself and throws out the necessary ma-
terial to produce a perfect union.

It should also be stated that many of plaintiff's ex-
pert witnesses, on cross-examination, in answer to hypothet-
ical questions, testified that defendant's treatment was in
accordance with the usual and customary methods of re-
ducing fractures at the time the different operations were
performed, and in the city of Des Moines.  Indeed, under
the record, we see no reason for criticizing it, save, perhaps,
for the defendant's delay in discovering the nonunion, the
shortening of the leg, and perhaps in not using the skia-
graph sooner than he did.  It should be remembered in
this connection that Dr. Losh assisted defendant in the
treatment of the case, and that he discovered no shortening
until his attention was called to the matter by the patient.
Several X-ray pictures were taken of plaintiff's limb under
the directions of Dr. Losh, and two other physicians had
others taken.  The results of these are not shown in the
testimony, nor does it appear whether these results were
ever communicated to the defendant.  If they were, it is in
evidence that defendant's treatment, after he discovered
the shortening, was proper, and that, after discovering the
nonunion, he performed the necessary operation, and that
this was timely.  If plaintiff has any case at all, it is due
to defendant's negligence in applying the Lane plate, and
the only direct testimony on the point comes from plain-

tiff's brother. We have set out the substance of all of this, and are constrained to hold that it is so unsatisfactory, and so general in character, and the witness' opportunity for inspection and investigation so meager, that a verdict, if returned thereon, could not be sustained. The description the witness gives of the plate and of the methods of the operator is so general that it would not do to found a verdict thereon. This, as we think, is the pivotal point in the case. There was a nonunion of the bones for some reason which the experts fail to explain, except to say that nature fails sometimes to make the necessary union, without any fault's being attributed to the operator. This theory is fortified by the further fact that, after plaintiff was taken to Chicago and placed in the hands of one of the most skillful operators in the country, he, too, had to resort to three operations before he secured a union, and the shortening of the limb resulted after Dr. Murphy took the case in charge. It does not appear that this final shortening of the limb was due to anything which defendant did or neglected to do. It might be true, of course, that defendant should be held liable for delayed union, or for pain and suffering and loss of time, although not held responsible for the permanent shortening of the limb; but to hold him liable for this, it must be shown that these things resulted proximately from defendant's lack of care in handling the case. There were not, we think, sufficient grounds to justify a verdict for plaintiff on this theory, and the court did not err in directing a verdict for defendant.

II. Some complaints are made of rulings on the rejection of testimony. Few of these need be noted. Generally speaking, the errors were cured, and the testimony admitted in response to other interrogatories. We have already disposed of one of these matters; that is to say, plaintiff's right to show that defendant did not administer con-

4. NEGLIGENCE: pleading: enumerating grounds of negligence: effect.

stitutional treatment to assist nature in the formation of material necessary to a union of the bones. This was properly denied, because no such issue was tendered by the pleadings.

Plaintiff was permitted to show that,
5. EVIDENCE: relevancy, materiality and competency: similar transactions: malpractice.
some years before the accident in question, he had suffered another fracture, this time of the bone below the knee. He was denied the right to show how long he was disabled by reason of this fracture. As the fractures were not similar in kind or nature, there was no error here. We suppose the evidence was offered to show that there was a union at that time within the usual period, but no such claim was made when the testimony was offered.

No error appears which would justify a reversal, and the judgment must be, and it is,—*Affirmed*.

GAYNOR, C. J., WEAVER and PRESTON, JJ., concur.