Argued October 5, affirmed November 9, 1920.

## ENGSTROM *v.* WISE DENTAL CO.

(193 Pac. 187.)

**Physicians and Surgeons—Reputation for Care Inadmissible on Issue of Negligence.**

1. In an action where negligence on the part of a dentist is charged, evidence as to his reputation for care is inadmissible.

**Trial—Refusal of Instruction Harmless in View of Instruction Given.**

2. In an action for dental malpractice where the jury were charged that the only negligence for which defendant could be liable was that alleged and that it was essential to recovery that such negligence be the proximate cause, etc., the refusal of a requested instruction that, where there were two or more possible causes of the condition from which plaintiff suffered, plaintiff, to recover, must show that the injury was the result of that cause which would render defendant liable, was harmless.

**Physicians and Surgeons—Malpractice Held for Jury.**

3. In an action for dental malpractice, the question whether defendant was negligent in extracting and treating a tooth so as to become responsible for an infection *held* properly submitted to jury.

 [For authorities on the duty and liability of dentist to patient, see note in Ann. Cas. 1914A, 273.]

From Multnomah: JOHN P. KAVANAUGH, Judge.

Department 1.

The plaintiff is a girl, a native of Finland, who recently came to the United States, and at the times alleged in the complaint did not understand, read or speak the English language. The defendant is an Oregon corporation with its principal office in the City of Portland, and was there engaged in dental surgery and the practice of dentistry. About April 4, 1918, the plaintiff employed the defendant to do certain dental work for her at the agreed price of $25, of which $5 was then paid, in consideration of which the defendant was to extract some teeth for her in a careful and skillful manner.

The plaintiff alleges that while she was under its care, in violation of its duty, the defendant was negligent and careless in treating and caring for her in extracting a tooth from her lower left jaw, in subsequent treatment, and in the use of certain drugs, medicines and unclean and defective instruments; that by reason of the use of instruments which were unclean and unfit the plaintiff's left lower jaw was poisoned and became swollen, inflamed and diseased; that she was rendered sick and injured in her health and constitution; that she suffered much pain and required the attendance of a skilled surgeon; that her jaw had to be lanced; and that she was permanently disfigured in and about her face and neck, suffered great physical and mental anguish, and was confined in a hospital—by reason of which she claims damages in the sum of $2,500.

The defendant admits its incorporation and the employment as alleged, makes a general denial of all other allegations of the complaint, and for its separate answer alleges:

"That at the time of the employment of defendant
by plaintiff as alleged in the complaint it was under-
stood and agreed between plaintiff and defendant
that the defendant was to extract certain teeth and
to cure and properly take care of plaintiff's jaw after
they were so extracted and to do such work in a
careful manner, and to attend and doctor plaintiff
until the jaw where said teeth were extracted should
be healed, and that plaintiff should attend to and
follow the instructions of defendant and report fre-
quently to the office of defendant for examination
and treatment until said jaw should be healed."

It is averred that the defendant "instructed plain-
tiff to keep said jaw cleansed and free from infection
and report at once to defendant any unusual pain or
condition of said jaw"; that she neglected to comply
with instructions or properly to care for and treat
her jaw; and that her injuries were the result of her
own carelessness and negligence. As a second fur-
ther and separate answer the defendant pleads:

"That the alleged injury and damage to plaintiff
was caused proximately by her own negligence and
want of care in failing to require or permit defend-
ant to care for and treat her jaw until the same was
healed."

The plaintiff makes a general denial of the answer
and further alleges:

"That she asked the defendant to examine her jaw
to ascertain whether or not they had left a piece of
the root therein; that they injected in her jaw a
metal instrument; and that in a few hours thereafter
plaintiff was in great pain and was thereafter re-
moved to the hospital, with the results as set forth
in plaintiff's complaint."

During the trial, over the objection of the plaintiff,
the defendant was permitted to introduce testimony
tending to show that the plaintiff had some teeth

extracted in Finland and that a portion of one of the roots had been left embedded in her left lower jaw near the point where the defendant had removed one of her teeth. This was for the purpose of tending to prove that the injuries which the plaintiff sustained were the result of the dental work done in Finland. At the conclusion of the evidence the plaintiff moved "to strike out all testimony offered in this case for the defense which tends to prove the cause of this injury by matters other than those set out in the pleadings," and that the jury should not "consider any evidence which was offered and tended to prove that this trouble might have arisen from a latent tooth held back under the other teeth as described." This motion was overruled. Counsel for the plaintiff then said:

"I want to ask the defendant now whether or not in the light of the court's ruling in this matter he wishes to amend his answer to include these facts, or whether he wishes to stand on the answer as prepared."

The court remarked: "You would probably better give him a little time to answer that."

And counsel for the defendant replied: "Yes, I will determine later."

No motion to amend was made.

The jury returned a verdict for the plaintiff in the sum of $800, upon which judgment was entered. The defendant appeals.                                    AFFIRMED.

For appellant there was a brief over the names of *Mr. George L. Masten* and *Mr. F. M. Phelps,* with an oral argument by *Mr. Masten.*

For respondent there was a brief over the name of *Messrs. Collier & Collier,* with an oral argument by *Mr. H. E. Collier.*

JOHNS, J.—1. The defendant contends that the trial court erred in refusing to permit the physicians to testify as to the reputation of Dr. Fellows in the community as a dentist, and as to his professional skill. The complaint is based upon negligence in the care and treatment of the plaintiff, not upon defendant's lack of knowledge or experience in the profession. In 5 Thompson on Negligence, Section 6712, it is said:

"Where the physician or surgeon is charged with negligence, and not with incompetency, the matter of his fitness is not an issue, and evidence to show competency and skill is clearly inadmissible"—citing a large number of authorities.

We hold that this is the law.

2. The defendant predicates error on the court's refusal to give the following instruction:

"Where there are two or more possible causes of the condition from which plaintiff suffered, for one or more of which the defendant is not responsible, the plaintiff, in order to recover, must show by a preponderance of the evidence that the injury was wholly or partly the result of that cause which would render the defendant liable. If the evidence in this case leaves it just as probable that the condition was the result of one cause as much as the other, the plaintiff cannot recover."

This is substantially a copy of an instruction which was requested and refused in *Meriam* v. *Hamilton,* 64 Or. 476 (130 Pac. 406). It was there held that its refusal was error. But it will be noted that that case was based upon different pleadings and another state of facts; that there a motion for nonsuit was made and overruled; and that this court reversed the ruling, held that the motion should have been sustained, and for that reason dismissed the action. As-

suming that such testimony in the instant case was admissible under a general denial and that the above instruction should have been given, was the refusal to give it prejudicial error? The jury was clearly and fairly instructed that the plaintiff must recover, if at all, upon the cause of action alleged in her complaint. In its charge the court used the following language:

"The only negligence for which the defendant can be liable in this case is the negligence in one or more of the particulars alleged in the complaint. * * Another essential to recovery is that the negligence alleged in the complaint must be the proximate cause of the injury. The proximate cause of an injury is the cause which produces the injury and without which injury would not have been sustained. The burden of proof in this case is first upon the plaintiff to satisfy you by a preponderance of the evidence that the defendant was guilty of negligence in one or more of the particulars alleged in the complaint, and that such negligence, if any, was the proximate cause of her injury. * * And if you are not satisfied by a preponderance of the evidence that the defendant acted unskillfully and negligently, or used unclean instruments as alleged, and further, that such use or such practice was the direct and proximate cause of an infection of plaintiff's left lower jaw, then your deliberations will be at an end, and you must return a verdict for the defendant in this case. If, on the other hand, you are satisfied by a preponderance of the evidence that the defendant was guilty of negligence in one or more of the particulars alleged, and that such negligence was the proximate cause of the injury to plaintiff's jaw as alleged, then you should proceed to the consideration of the other issues involved in this case."

In other words, the jury was told that the plaintiff must prove her cause of action as alleged, not only that the defendant was negligent, but that she sus-

tained her injuries as the result of that negligence. In effect, the jury was instructed that, although it found that the defendant was guilty of negligence, before it could return a verdict for the plaintiff it must further find that such negligence was the proximate cause of her injuries, and that if the plaintiff sustained her injuries at another time or place, in a different manner, or from another cause than as alleged in her complaint, she could not recover. Under such instructions the refusal to give the requested charge was not prejudicial error.

There was no error in modifying the defendant's requested instruction No. 2. As given, it was based on the pleadings.

3. The remaining question is whether or not the motion for a nonsuit or directed verdict should have been allowed. Dr. Sabin, a reputable physician in the City of Portland, as a witness for the plaintiff testified:

"Q. The evidence here, Doctor, is that there was a probe or needle of some kind injected into that tooth about three weeks after it had been extracted. She returned to the dentist and made some complaint that the tooth was not healing, and an examination was made by a probe into the jaw. I will ask you whether or not, if that probe had been infected, it would have caused that result if it had not been properly sterilized?

"A. Surely, any instrument that might have infection on it will carry infection into the tissues, even though it were properly sterilized, if it were passed through an infected area, and all wounds in the mouth are infected. It might affect it that way surely.

"Q. Doctor, if this infection had been caused by the insertion of this instrument into the jaw, how long would it have been before the patient would begin to suffer pain?

"A. Well, if the probe were passed down into the tissues that were not invaded, the pain and swelling, aside from the infection, might be almost immediate, although it might take several hours for the infection to manifest itself.

"Q. Would it be noticeable if it was used about 3 or 4 o'clock in the afternoon, would the patient begin to notice it at night?

"A. Yes, might notice the effect of pain and swelling even though the active infection had not taken place. * *

"Q. Would it be considered an infected field if it was in the mouth or in the jaw where a tooth had been removed about three weeks before, and which had not healed?

"A. It would be invariably an infected field.

"Q. Then, what would be the nature of the treatment after removing that probe?

"A. Well, if I was doing it in another surgical wound, in the first place I would see that the probe was sterile, and if it had gone through uninfected tissue—that is, where the point of. difference comes in—if the probe was introduced simply into infected area it would not help it or do any harm, but if it went through into uninfected tissue there ought to be some method taken to prevent the extending of that infection."

Dr. Fixott, a witness for the defendant, gave the following testimony:

"Q. But you say the probing of a wound from which a tooth had been removed by an instrument which had not been properly sterilized would cause the swelling of the face and jaw and the ulceration, did you not?

"A. The use of an unsterilized instrument would cause all kinds of swelling."

Dr. Fellows, who did the dental work for the plaintiff, as a witness for the defendant testified:

97 Or.—41

"Q. The judge on the bench asked you a question yesterday, if you could swear that you sterilized this instrument immediately before using it in this girl's mouth, to which you replied that you could not. Is that correct?

"A. If the testimony shows so, yes.

"Q. Well, have you had occasion to change your mind over night?

"A. I have not.

"Q. Is that true this morning? That is, you don't know whether you sterilized the instrument or not?

"A. I did not sterilize the instrument."

The plaintiff testified as follows:

"Q. Did you see the instrument the doctor had here yesterday in his hand?

"A. Yes.

"Q. The one that he called an explorer, which he said he used in exploring your jaw?

"A. Which one do you mean?

"Q. The one he had yesterday, the one I show you now; did you see this instrument yesterday?

"A. Yes.

"Q. Is that the kind of an instrument he used on your jaw?

"A. No.

"Q. What kind of an instrument was it?

"A. It was straight and sharp.

"Q. Did it have a crook on it at all like this one?

"A. No.

"Q. Now, Ellen, I will ask you, did he put that instrument in your jaw in the place where he took out a tooth?

"A. Yes, sir.

"Q. When you first felt a pain after you went home, where did you first feel it?

"A. Right there where he struck that instrument.

"Q. Did you have any trouble with your teeth that you had pulled out while you were over in Finland, back of those?

"A. No, not any.

"Q. Where was this pain and seat of this trouble in your jaw with reference to the tooth Dr. Fellows pulled?

"A. It was in the place where the tooth was pulled out."

After verdict, we must assume this testimony to be true. The plaintiff testified that the instrument which Dr. Fellows used was not the one which was produced in court; that she first felt a pain in her jaw after she went home, "right there where he stuck that instrument"; that she had never had any trouble with the teeth which she had had pulled out while she was in Finland; and that the seat of the pain "with reference to the tooth Dr. Fellows pulled" was "in the place where the tooth was pulled out." Dr. Sabin testified that, if an infected instrument was used about 3 or 4 o'clock in the afternoon, the patient would begin to notice it the same night, "even though the active infection had not taken place." The plaintiff was at the defendant's office about 3 or 4 o'clock in the afternoon and testified that she had a severe pain in her jaw that same evening. Dr. Sabin's testimony strongly corroborates that of the plaintiff as to the actual facts to which she testified. This evidence is direct and positive, and, assuming it to be true, the proximate cause of plaintiff's injury is not speculative or uncertain. The case of *Spain* v. *Oregon-Wash. R. & N. Co.,* 78 Or. 355 (153 Pac. 470, Ann. Cas. 1917E, 1104), is not in point.

As we analyze it, there is ample testimony to support the verdict. Although the plaintiff could not speak or understand English and had to testify through an interpreter, the jury must have believed her evidence and that the proximate cause of her in-

jury was the neglect of the defendant to use due care in her treatment.

The judgment is affirmed.        AFFIRMED.

McBRIDE, C. J., and HARRIS, J., concur.

BURNETT, J., Dissenting.—This is an action against the defendant to recover damages for alleged malpractice in dentistry. The complaint alleges the employment of the defendant in these terms:

"That on or about the fourth day of April, 1918, the plaintiff employed and retained the defendant for a good and valuable consideration, and at the special instance and request of the defendant, to do and perform certain dental work for the plaintiff at its place of business in said City of Portland, which consisted, among other things, of extracting certain teeth and partial upper and lower plates for plaintiff's upper and lower jaws and putting gold crowns on certain teeth of the plaintiff, for which plaintiff promised and agreed to pay the defendant the sum of $25, and that the defendant was to extract certain teeth and to cure and properly take care of the jaw after they were so extracted, and to do such work in a careful and skillful manner, and to attend and doctor the plaintiff until she was healed and the jaw where said tooth was removed was well, and otherwise to render the plaintiff such care as said treatment required, and to carefully and skillfully look after and take care of her physical condition and health in so far as the extraction of said tooth and the care of the jaw during the time said treatment was administered to the plaintiff by the defendant."

The grievance complained of is couched in the following language:

"That the defendant while so employed and acting, and while in charge of treating the plaintiff, and while plaintiff was under the care of the defendant, the defendant then and there, in violation of its duty,

negligently and carelessly behaved and governed it-
self in and about the care of said plaintiff, and in
and about the treating and caring for plaintiff's lower
left jaw after the extraction of a tooth therefrom,
and in the extraction thereof, and in the use of cer-
tain drugs and medicines and unclean and defective
and unwholesome instruments, and in not using
proper care, attention, and medicaments, appliances,
and skill, and the treatment of said lower left jaw,
and by and through the negligence and carelessness,
default, and unskillfulness of said defendant in so
treating and taking care of the plaintiff's lower left
jaw, and by the use of instruments that were unclean
and unfit for use, which were used in penetrating
said left lower jaw of plaintiff, the blood of plain-
tiff's left lower jaw was' poisoned and caused to be-
come swollen, inflamed and diseased, and plaintiff was
thereby rendered sick and greatly injured in her
health and constitution and made to suffer much
pain.''

The remainder of the averment is devoted to a
recital of the resultant injuries and the amount of
damage.

The answer traverses the complaint except as to
the employment, the teeth extracted, and the corpo-
rate character of the defendant, and charges con-
tributory negligence on the part of the plaintiff in
that she did not obey instructions to come frequently
to the office for treatment until the jaw should be
healed; and that she neglected properly to care for
and have the jaw treated. This in turn was denied
by the reply. The trial resulted in a verdict and
judgment for the plaintiff, and the defendant appeals.

It will be noted at the outset that according to the
complaint the defendant was not employed to hunt
out concealed and broken roots of teeth, but to ''ex-
tract certain teeth.'' There is no pretense in the
complaint that the defendant extracted, or was to ex-

tract, any other than those that were actually taken from the mouth of the plaintiff. To extract other teeth or concealed roots of teeth would not be within the scope of the contract alleged.

As to the use of instruments, the complaint does not charge the defendant with using a clean instrument unskillfully so as to infect the jaw, but with using unclean instruments, by reason of which the plaintiff's blood "was poisoned and caused to become swollen, inflamed, and diseased," whatever that may mean. Aside from the charge that the defendant used unclean and unfit instruments "which were used in penetrating said left lower jaw of the plaintiff," the complaint does not state what the defendant did that should not have been done, or what it failed to do that it should have done. The controversy centers around the charge that the defendant used an unclean instrument in penetrating the plaintiff's jaw. The substance of her grievance is that her jaw became infected after the extraction of her teeth, and she attempts to attribute that to the defendant.

Another principle to have in mind as we proceed is that in treating a surgical case the operator who with reasonable diligence employs the skill of which he is possessed is not liable for an error of judgment, and the mere fact that an untoward result ensues is not evidence of negligence: *Hills* v. *Shaw*, 69 Or. 460 (137 Pac. 229), and precedents there cited.

The testimony discloses that the plaintiff went in company with Mrs. Alama to the defendant's dental rooms three times. The first time, she contracted with the defendant to extract some teeth from the upper jaw and three others from the lower jaw, and to make her an upper and a lower plate of artificial

teeth. The plaintiff herself testifies in substance
that at the first visit the dentist extracted twelve
upper teeth and "there was a little pain, not much."
In a week she and her friend went again, when the
dentist pulled two teeth from the right lower side
and one from the left lower jaw. She said the latter
was a sound tooth, but "he said it had to be pulled
so as to fit the upper plate, and I consented." She
says that she returned about three weeks afterwards,
"because the tooth that was pulled from the left side
did not heal up or get well." At that time, she says,
"we asked him what was the matter with that, if
there was any root left, because it was creating some
pain." The dentist had her get into a chair, she
testifies, "took an instrument from the shelf, and
stuck it in where the sore spot was in the left jaw.
He said there was no roots in there; that everything
was all right." She declares that he did not use
any water, wash, or spray in her mouth. She says
she asked him why there was such a pain there, and
he wanted to know if it was very sore. She replied
that "it was not so very sore, but it had quite a pain
in there and ached." The witness continued:

"He said it was all right, and to come back in
about a week, and then he left the room. I have
never seen him since."

She said that her friend gave her some water, as
she had a bad taste in her mouth and had to have
water. The other teeth "had got well and were all
right." She says the operating dentist "put in the
instrument in only one place," and, to use her lan-
guage, "in a few hours it commenced an awful
pain." The second day after her last visit she went
to Dr. Sabin, a physician and surgeon, who exam-
ined it, and she went home and then to the hospital,

where, on Monday morning following the Thursday of her last visit to the defendant, Dr. Sabin lanced the swelling. She testified that the swelling was all gone after about two weeks, but it had not healed up inside the mouth then. She said some pus ran out of the gum until about a month before the trial, when she had a root pulled out by Dr. Spalding. She said she did not discover that a root was left in the jaw until an X-ray picture was taken about two months before the trial, and that there was no pus coming out since the root was extracted; that the pus discharge continued for about a month or so after leaving the hospital, although there was not much running out of it, but after that it commenced to get worse, and continued until the root was removed. She said this root was taken from the same place where the tooth was pulled. She says two other teeth were "taken out in the 'old country' about three years ago," and were somewhat defective and broken; and that there was a little pain in the lower jaw all of the time. She says, "before I went there the last time it got a little worse."

Mrs. Alama tells practically the same story about the plaintiff's going to the defendant for treatment. But that witness said:

"She had an awful time with her upper gums, and she said there was only the walls there and they were jerking, and that made it ache."

Describing the examination of the place where the tooth was extracted from the lower left jaw, the witness said:

The dentist put the plaintiff in a chair, "and then he took a kind of instrument and stuck right in there and said, 'That will be all right. That is no root.' He told her there was no root and no danger. I did not see him use it before [putting it in her mouth],

but he took it off the shelf. I don't know whether it was washed or not."

"Q. Now, did you notice whether or not he did anything towards sterilizing or cleaning that instrument before he put it in her jaw?

"A. No, he did not; he just took it from the shelf and stuck it right into her mouth."

She also said there was a little swelling, but not very much, before going to the office the third time.

Mrs. Cronan, for whom the plaintiff worked at the time, said her face was not right and was hurting her before the last visit.

Dr. Sabin, the surgeon to whom the plaintiff went, was asked:

"What was the nature of the infection or the cause of it?

"A. Well, that is something that is pretty hard to determine. Of course, we knew she had an extraction of a tooth, and we considered it was secondary infection from that. * * Well, a primary infection at the point where the tooth was extracted, and a secondary infection extending through the tissues and down the lymph spaces to some other point.

"Q. I want to know what caused that swelling there and the infection.

"A. Well, it is a bacterial infection, of course, but what nature it was would be almost impossible to determine. Some of the bacteria that are in the mouth and it would get in that way into the primary infection, into the primary source of the infection."

Referring to the other teeth that had been removed, he was asked:

"If it would be infection from the mouth, I will ask you whether or not it would have been as likely to infect the others as that tooth?

"A. Why, yes, theoretically so; yes, sir. * * Surely, any instrument that might have infection on it will carry infection into the tissues, even though it were

properly sterilized, if it were passed through an infected area, and all wounds in the mouth are infected. It might affect it that way surely. * *

"Q. Would it be considered an infected field if it was in the mouth or in the jaw where a tooth had been removed about three weeks before, and which had not healed?

"A. It would be invariably an infected field. * * If the probe was introduced simply into infected area, it would not make any difference what you did, because it would not help it or do any harm; but, if it went through into uninfected tissue, there ought to be some methods taken to prevent the extending of that infection.

"Q. Would that have been probable in inserting a probe in the jaw such as I describe?

"A. I do not know. I do not know how far along the healing of that wound had progressed. * *

"Q. Suppose there was an abscess under a tooth and the tooth was removed, what effect would that have on the abscess?

"A. Well, usually that destroys the abscess; in other words, it gives drainage, which would be a desirable thing in any abscess.

"Q. If a tooth had been removed for a period of three weeks and had an abscess there, do you think the patient would have had any notice of it, or noticed any ill effects of it within that time?

"A. Well, except under the possible condition that there might have been something over the top of the infection that was there, and sealing it in again.

"Q. Supposing the tooth was sound and no fault found with it, no trouble with the tooth whatever, but simply removed for the purpose of putting in a plate because it would be in the way. Would the pulling of it create such a condition as you found in this jaw, the mere pulling of a tooth?

"A. That is a possibility, yes. You have a raw, open wound which may be infected.

"Q. But, if it was caused by the pulling, how long would it be before it would develop?

"A. Oh, that is impossible to make any definite statement about that.

"Q. Approximately?

"A. Anywhere between three days, three or four days, and ten days, something of that sort.

"Q. Doctor, if it were admitted that in that same jaw there was the root of a tooth which did not come out, would it be possible for an abscess to lie concealed at the bottom of that root without being discovered at the time of the extraction of the tooth?

"A. I should judge so; yes.

"Q. And would the removal of any neighboring teeth be apt to disturb the surrounding of that abscess so that it might develop into the condition in which you found this patient? * * If a sound tooth were removed leaving in the jaw this root, would it be possible for an abscess to lie concealed at the bottom of this root without being detected by the dentist at the time?

"A. Yes."

Dr. Spalding, a dentist, witness for the plaintiff, testified that he extracted the root of the third molar within thirty or forty days prior to the trial. Speaking of the root left in the lower left jaw, he said:

If there was considerable pain and something had to be done, "the only thing to do is to give an anesthetic and pull it out. If there was not very much pain, we generally leave those tissues come down to place, a process of absorbing, and they are easily taken out afterwards. If there is considerable pain, I would administer treatment. There is no prescribed treatment at all. The injection of an instrument would not necessarily be a cause of pain or swelling. If there was a slight swelling of the jaw before the instrument was injected, I would not say the swelling was caused by the injection of the instrument."

This constitutes a circumstantial *résumé* of all the testimony on behalf of the plaintiff relating to the

uncleanliness of the instrument used, and the infection of her jaw. At this point the defendant moved for a judgment of nonsuit, which was denied and an exception taken.

On behalf of the defendant, Miss Newman testified that at the times the plaintiff visited the defendant's dental rooms she was an assistant there. She says the instruments were always put in a solution of lysol and were always given a formaldehyde sterilization until they were used for the patient.

"Q. Was it the habit of the doctor to pick them up and sterilize them just before he put the instrument in the mouth?

"A. No; they were always sterilized first.

"Q. So that when they were laid on this long table ready for use, are they sterilized or unsterilized?

"A. They were sterilized."

Dr. Fixott, a dentist, testified about a skiagraph taken January 30, 1919, of the plaintiff's lower left jaw, which showed a piece of the root of a molar, probably the second, with an abscess at the apex buried under soft tissue, that could not be detected by ocular examination. Speaking of the effect of an ulcerated tooth, he testified in substance that, if the patient was in first-class physical condition and resistance was great, it would overcome a great deal of infection and it would not appear. On the other hand, if the patient's health was below par, it could appear at almost any time; further, a disturbance of any kind could cause an abscess to appear, for instance, the wearing of a plate, the disturbance of the tissues, traumatic bump, or the extraction of any other piece; anything of that kind that would disturb the tissues would cause superactivity of the germs in the pus surrounding the abscess which would cause that to become active; also, that an acute

abscess can form very quickly from disturbance of a local abscess that has given no evidence of trouble. Dr. Ross, a witness for the defendant, examined the plaintiff December 18, 1918, and found a pin-point opening one-half inch back of the first bicuspid, which discharged pus on pressure, and there was a small healed dimple immediately back of the first bicuspid, indicating recent extraction of the second bicuspid. Dr. Fellows, the operating dentist who extracted the plaintiff's teeth, said she came first on April 4, 1918, and had a lot of bad roots in both the upper and lower jaws. He said he cautioned her particularly to keep the mouth washed out with hot salt water many times a day, and if it got sore to come back and let him attend to it. He says he took the teeth out just as easily as he could, and that "they were in bad condition; the roots had abscesses on them, and when you take out a root like that it has a little sac hanging on it like a pea until the tooth dries up and there is a little piece generally hangs on to the tooth and sometimes it does not." He says that one week later, after the first visit, the plaintiff came again, when he extracted a molar and a bicuspid from the right lower jaw, and the second bicuspid from the left lower jaw. The latter was a sound tooth, he says, but crooked, so that it had to be pulled to make the plate fit properly. He says it came out perfectly and that there was nothing left; also, that the root extracted later by Dr. Spalding and introduced in evidence is the root of a molar.

When the plaintiff came the last time, Dr. Fellows discovered that the place where he had extracted the bicuspid from the left jaw was a little bit inflamed, and he took an explorer and put it into the socket. He described an explorer, saying, "It is a little sharp pointed instrument." He says that as soon as

he put the instrument into the plaintiff's mouth, the gums bled a little, and he immediately put tincture of iodine in the socket with a little absorbent cotton, which he always had ready "if the gum is cut or anything, because tincture of iodine I believe is the very best antiseptic a person can get." As to the cleanliness of the instrument, he testified:

"Every instrument, every time we use it, is put on the bracket and is not used again in any other patient's mouth until it is sterilized on the electric sterilizer. But lots of times, even if I have used this instrument on a person and I put it down, I dip it in a ten per cent solution of lysol before I put it back. I don't always do it, but I do it lots of times. * * I would not swear I did that on this occasion. It is a very hard thing to remember. It is a habit a dentist gets into. * * Well, I know these instruments were sterilized before they were put on my bracket to use. I know that, absolutely, they were sterilized."

He also testified that he inserted the explorer in her mouth only once and did not use it on her again. This accords with the statements of the plaintiff and Mrs. Alama. He declared that the plaintiff's trouble was caused from "that root that was in there, away back." He said he would not have used the explorer, but "she asked me if there was a root down there and I went down to see." He said that he did not sterilize the instrument immediately before using it in her mouth, as "it was sterilized before it was brought to me. I did not sterilize the instrument." In rebuttal, the plaintiff testified in substance that the instrument shown her was not the kind of an instrument Dr. Fellows used on her jaw. She said that the one so used was straight and sharp and had no crook on it like the one shown in court.

From the case made by the testimony for the plaintiff, the charge that the instrument used was unclean and unfit is utterly without support. On the other hand, the testimony for the defendant, that of Dr. Fellows, and the attendant, is positive that the instrument was sterilized before being used in the mouth of the plaintiff. They are utterly undisputed on this subject. In other words, the plaintiff's witnesses did not know whether the instrument was sterilized or not, while those for the defendant, positively declared that it was. Speaking about such a situation, Mr. Justice ALLEN in *Nevinger* v. *Haun*, 197 Mo. App. 416 (196 S. W. 39), a case as nearly like the present as one could be like another, used this language:

"Defendant's testimony, uncontradicted, is that he sterilized his instruments before putting them away in the case wherein they were kept when not in use. Plaintiff contends that this testimony should not be reckoned with, for the reason that the jury could disregard it if they saw fit. But the doctrine for which appellant contends in this connection does not mean that where the burden is on the plaintiff to show a failure to do any act, and the defendant's evidence that he did do it is uncontradicted, then the jury may not only disbelieve his evidence, but may take such disbelief as supplying the affirmative evidence required of plaintiff. (Citing authorities.) Plaintiff adduced no evidence tending to show a failure on defendant's part to sterilize his instruments before thus putting them away."

Apropos of this situation, the defendant here made a timely request of the court to instruct the jury as follows:

"Where there are two or more possible causes of the condition from which plaintiff suffered, for one or more of which the defendant is not responsible, the plaintiff, in order to recover, must show by a prepon-

derance of the evidence that the injury was wholly or partly the result of that cause which would render the defendant liable. If the evidence in this case leaves it just as probable that the condition was the result of one cause as much as the other, the plaintiff cannot recover.''

We thus have a case in which the complaint is based upon the charge that the instrument used was unclean and unfit, in support of which there is no testimony whatever for the plaintiff tending to show that such was the condition of the instrument; while, on the other hand, the undisputed testimony for the defendant is that the instrument was sterilized, not necessarily by the operating dentist himself, but by his assistant. It is not a fair construction of his evidence to hang it all upon the isolated statement which he made, ''I did not sterilize the instrument.''

We have also the testimony of the expert witnesses to the effect that a tooth or fragmentary root ulcerated at the apex will become the active cause of swelling and abscess when disturbed by the extraction of other teeth, or by a diminution of the patient's power to resist the attack hitherto latent in the diseased tooth. We have the expert statement that there are infective germs in the mouth which would attack the wound of extraction and cause infection.

Viewed in the light of the expert testimony, the fact that there was swelling, with soreness, where the second bicuspid had been extracted from the lower jaw, would indicate that active infection had begun before the third visit of the plaintiff to the defendant's dental rooms. All of these things plainly indicate that it is a matter of speculation whether the abscess which caused the plaintiff's suffering was at-

tributable to the conduct of the dentist or to the
ulcerated root of the molar afterwards extracted by
Dr. Spalding. The testimony is undisputed that the
tooth drawn by Dr. Fellows was the second bicuspid,
while the root which Dr. Spalding extracted was that
of the third molar, and Dr. Ross declares that there
was a small healed dimple immediately back of the
first bicuspid, indicating a recent extraction of the
second bicuspid, and that further back, at the seat of
the molar teeth, was the point of ulceration, which
was then discharging pus on pressure. In other
words, the wound of extraction made by the defend-
ant's operator healed up perfectly, while the ulcera-
tion of the old root with which he had nothing to do
continued until its extraction by Dr. Spalding. No
one pretends that more than one tooth was drawn
from the lower left jaw. That is accounted for as
the second bicuspid by the testimony of Dr. Fellows
and of Dr. Ross, the latter of whom spoke about the
healed dimple. In short, it is a matter of guess and
speculation whether the infection was a case of auto-
intoxication originating from the ordinary infective
germs of the mouth or the ulcerated molar root, or
caused by the use of the instrument in question, even
conceding it was unclean.

*Spain* v. *Oregon Wash. R. & N. Co.*, 78 Or. 355 (153
Pac. 470, Ann. Cas. 1917E, 1104), was a case where the
plaintiff had lately had his arm amputated and it
had not healed. While on his way to consult his
regular physician, he was wrongfully arrested by the
defendant's conductor and other agents and incarcer-
ated for several hours in a filthy jail. He charged
that on that account his arm became seriously worse
than when the arrest was made and a second ampu-
tation became necessary. After reviewing the tes-

timony, Mr. Justice McBRIDE, who wrote the opinion, used this language:

"Now, from this testimony, which is wholly from plaintiff's witnesses, there may be drawn several inferences: (1) That the inflammation which ensued upon the 21st was a mere phase of an infection already shown to exist in the wound; (2) that it arose from plaintiff's activities around the race-track at Boise; (3) that it came from unsterilized dressings applied by Mrs. Simms before plaintiff's departure to Boise; or (4) that it arose from unsanitary condition existing in the jail at Huntington. There is no evidence which has a tendency to show from which of these causes the subsequent aggravated condition arose. It might have been from any one of them, or, if there exists any reason to differentiate, the first of the possible causes would seem the most probable, as there can be no question under plaintiff's own testimony but that some infection resulting in a discharge of pus existed at the time he left for Boise. That his arm was not in an entirely satisfactory condition while at and returning from Boise is shown by his complaint, which alleges that he was 'suffering from a recently amputated arm and was then on his way to consult his regular physician.' When the evidence leaves the case in such a situation that the jury will be required to speculate and guess which of several possible causes occasioned the injury, that part of the case should be withdrawn from their consideration": Citing *Armstrong* v. *Town of Cosmopolis,* 32 Wash. 110 (72 Pac. 1038).

In *Medsker* v. *Portland Ry., L. & P. Co.,* 81 Or. 63 (158 Pac. 272), a case where a lineman fell from a pole carrying electric wires, Mr. Chief Justice Moore reviewed the testimony and said:

"This constitutes the entire testimony relating to the cause of the injury. The death was undoubtedly occasioned by the fall, but whether the descent resulted from coming in contact with the south guy

wire, or was caused by the deceased losing his balance, is problematical.''

He then cites the Spain case, 78 Or. 355 (153 Pac. 470, Ann. Cas. 1917E, 1104), as controlling, so that the judgment for the defendant on a directed verdict was affirmed. In *Shaw* v. *New Year Gold Mines Co.*, 31 Mont. 138 (77 Pac. 515), a case covering a charge of negligence to the injury of the plaintiff, the rule is thus stated:

''The burden of proof is upon plaintiff, and is not satisfied if the conclusion to be reached from the testimony offered is merely a matter of conjecture. If such conclusion be equally consistent with the truth of the allegations, and with some other theory or theories inconsistent therewith, it becomes a mere conjecture, and the rule of the burden of proof is not satisfied. Thus, in an ordinary case of negligence, like the one under consideration, plaintiff has the burden of proving the negligence of defendant as alleged, and also that such negligence was the proximate cause of plaintiff's injury. If the testimony leaves either the existence of negligence of defendant, or that such negligence was the proximate cause of the injury, to conjecture, it is insufficient to establish plaintiff's case. If the conclusion to be reached from the testimony is equally consonant with some theory inconsistent with either of the issues to be proven, it does not tend to prove them, within the meaning of the rule above announced. The use of the word 'tend' does not contemplate conjecture. It contemplates that the testimony has a tendency to prove the allegations of the complaint, and not some other theory inconsistent therewith.''

*Parmelee* v. *Chicago, M. & St. P. Ry. Co.*, 92 Wash. 185 (158 Pac. 977), was a case where an administrator sued to recover damages for the death of her decedent who was killed while in performance of his duties as a brakeman in the employ of the defendant.

Mr. Justice CHADWICK reviewed the authorities, and the result of his investigation is summed up in the syllabus in these words:

"In an action for personal injuries, if the existing state of affairs, however dangerous, might, according to the ordinary experience of mankind, have been due to other causes than negligence for which the defendant was responsible, it is for the plaintiff to exclude the operation of ·those causes by the greater weight of evidence, since all accidents are not the result of negligence."

This case is cited by Mr. Justice HARRIS in *Bridenstine* v. *Gerlinger Motor Car Co.,* 86 Or. 411, 426 (168 Pac. 972).

It is not enough that an injury has happened. Neither is it sufficient to show that the act of negligence of the defendant may have been one of several possible causes producing the injury complained of. The rule of *res ipsa loquitur* does not apply to such cases: *Miller* v. *Blackburn,* 170 Ky. 263 (185 S. W. 864). To the same effect are *Nevinger* v. *Haun,* 197 Mo. App. 416 (196 S. W. 39); *Snearly* v. *McCarthy,* 180 Iowa, 81 (161 N. W. 108); *Inglis* v. *Morton,* 99 Wash. 570 (169 Pac. 962); *Curran* v. ·*Holt,* 117 Me. 369 (104 Atl. 579); *Honaker* v. *Whitley,* 124 Va. 194 (97 S. E. 808). All of these cases support the doctrine enunciated by Mr. Justice McBRIDE in the Spain case.

It is said, however, that because the court instructed the jury that the burden of proof was upon the plaintiff to establish negligence of the defendant, and, on the other hand, the burden was upon the defendant to establish contributory negligence of the plaintiff, there is no occasion for applying the rule thus announced in the decisions and enunciated in the request to charge. A further contention is made

that the pleadings do not support the request thus to instruct the jury. The general issue was joined, making it incumbent upon the plaintiff to prove her charge. If the testimony disclosed that the injury occurred from some other cause, for which the defendant is not responsible, the moving party experienced a failure of proof which should inure to the benefit of the defendant. As to the propriety of the charge, in addition to the platitudes of burden of proof, it is said in 38 Cyc. 1623:

"In order to justify the court in giving an instruction, predicated on a supposed state of facts, it is not necessary that the court should be entirely satisfied of the existence of the facts upon which the instruction is founded. According to one line of cases, any evidence tending to prove a fact is sufficient to justify the court in giving an instruction applicable to it if requested so to do, even though the evidence be so slight as to be insufficient to support a verdict founded on it. * * It is not the proper course for a judge to lay down the general principles applicable to a case, and leave the jury to apply them; but it is his duty to inform the jury what the law is as applicable to the facts of the case."

The judge very carefully instructed the jury about the burden of proof on the party holding the affirmative of any issue, contrasting the charge of negligence made by the plaintiff and the imputation of contributory negligence coming from the defendant. The requested instruction, however, presents a different phase, namely, one where there is no negligence on the part of either the plaintiff or the defendant. The plaintiff was not to blame for the poisoned condition of her mouth, arising from the hidden ulcerated root; and, if the case was one of auto-intoxication, the defendant could not be blamed for that, where the plaintiff did not present herself for treat-

ment. The undisputed evidence of the physicians was that the place where the second bicuspid had been extracted by Dr. Fellows had healed up and that the discharge of pus from the ulcerated molar root was still continuing. Without reference to whether a nonsuit should have been granted or not, the defendant was wholly entitled to the requested instruction as illustrating a situation derivable from the testimony, where the abscess which gave the plaintiff so much pain arose from a cause for which the defendant was not responsible.

In short, the only testimony about the instrument used is in favor of its cleanliness. There is no testimony to the contrary on behalf of the plaintiff. That she may have suffered from an abscess is not shown to be attributable to the defendant. But, all that aside, the defendant was entitled to the instruction mentioned, as covering a phase of the case where no negligence was shown against either party. In the very nature of things, neither the dentist nor the surgeon can be a warrantor of cures. A machinist may take a disordered engine and guarantee that he will repair it so that it will be a perfect machine, and he will be answerable in damages if he fails in his undertaking. Not so, however, with the surgeon or dentist. The imperfections and idiosyncrasies, the physical weaknesses, and latent diseases of his patient, are obstacles which beset him and which he cannot always overcome. In fact, he inevitably loses the contest in the end, for death comes to all some time. It would utterly destroy the art of healing, if the rules were made as stringent against such men as they are against the machinist, the carpenter, or the blacksmith. In the instant case nothing more appears than that an untoward result happened. It is

not shown that if it had been given the opportunity the defendant could have administered any different treatment from that given by Dr. Sabin. The motion for nonsuit ought to have been granted, in default of which the instruction requested should have been given.

For these reasons, I dissent from the opinion of Mr. Justice JOHNS.