Argued October 27, reversed December 7, 1915.

# SPAIN *v.* OREGON–WASHINGTON R. & N. CO.

### (153 Pac. 470.)

**Appeal and Error—Review—Finding on Conflicting Evidence.**

1. A jury's finding on substantial conflicting evidence cannot be questioned on appeal.

**False Imprisonment—Persons Liable—Carriers—Arrest of Passenger by Conductor—Liability of Road—Statute.**

2. Under Laws of 1911, Chapter 135, providing that to be intoxicated or to drink intoxicating liquor in an ordinary passenger car is a punishable crime, and Section 6959, L. O. L., declaring that the conductor of a railroad train, while actually engaged as such, shall have the power of a sheriff, in each county through which the train passes, to protect the public peace and arrest violators thereof on or near the train, where defendant railroad's conductor arrested a sober passenger on the pretext that he was drunk, the railroad could not escape liability for the tort on the ground that the conductor was acting as sheriff and had laid aside his character as defendant's servant.

> [As to what amounts to false imprisonment, see note in 118 Am. St. Rep. 719.]

**False Imprisonment—Evidence—Good Faith.**

3. In an action against defendant railroad by one claiming to have been arrested by the conductor, ejected from the train, and thrown into prison for drunkenness, when in fact perfectly sober, testimony that plaintiff's companions, who drank with him from the same bottle, were not disturbed by the conductor, was admissible as bearing on the good faith of the conductor in making the arrest.

**Evidence—Res Gestae.**

4. Such testimony was admissible as part of the *res gestae.*

### False Imprisonment—Evidence—Continuing Character of Tort.

5. Where defendant railroad's conductor arrested plaintiff on the pretext that he was drunk, ejected him from the car, and turned him over to the railroad's watchman, who incarcerated him in a city jail, the road's trespass was one continuing through the incarceration and up to plaintiff's release, and it was liable for the imprisonment, as well as the unlawful ejection, so that evidence was admissible to prove the condition of the city jail.

### False Imprisonment—Damages—Mental Suffering.

6. Where a railroad passenger was taken from the train by the conductor and other agents of the road on the pretext that he was drunk and drinking in the car, which arrest was accomplished with some degree of physical force and involved a false imprisonment of the passenger, in his action against the road he could recover for humiliation on account of the public ejectment from the car, although, except in cases of slander, breach of promise, and the like, a recovery for mental suffering unaccompanied by physical injury will not be permitted.

### False Imprisonment—Evidence—Relevancy.

7. In an action against a railroad for injuries sustained by plaintiff when arrested for drunkenness, by defendant's conductor, ejected from the train, and imprisoned, testimony of a witness, who had given plaintiff the bottle from which he was drinking at the time of the arrest, which plaintiff claimed contained ginger ale instead of beer, that he (the witness) was a good, clean athlete and drank no liquor, was admissible.

### Judgment—Conclusiveness—Conviction of Crime.

8. Where defendant railroad ejected plaintiff passenger from its train, arresting and imprisoning him in the city jail for being drunk and drinking on its car, plaintiff's plea of guilty to a charge of being drunk and disorderly in the city had no conclusive effect in his subsequent civil action for his arrest and ejection by the road.

### Evidence — Admission — Record of Previous Conviction on Plea of Guilty.

9. Where plaintiff passenger, after his arrest by defendant railroad's conductor and ejection from the train for being drunk, pleaded guilty to a charge of being drunk and disorderly in the city, the record of the conviction, in plaintiff's subsequent suit against the road for his arrest by the conductor, was admissible in evidence as an inconclusive admission against plaintiff's contention in the suit that he was sober when arrested.

### Trial—Taking Case from Jury—Speculative Verdict.

10. In an action by a railroad passenger for his arrest and ejection from defendant's train as intoxicated, and his subsequent imprisonment, which he claimed caused him to undergo a second amputation of his arm, where plaintiff's evidence as to the cause of such second amputation left it a matter of speculation whether the cause thereof was a cold caught in the jail in the unhealed original amputation, or infection from unsterilized bandages, etc., the court should have withdrawn from the jury the subject of the second amputation, as an element in plaintiff's recovery, since, when the evidence leaves the case in such situation that the jury must guess as to which of

several possible causes occasioned the injury, such part of the case should be withdrawn from their consideration.

**Trial—Verdict—"Quotient Verdict."**

11. A "quotient verdict," reached by the jurors adding their several amounts of recovery and dividing the sum by their number, is illegal.

**Trial—Verdict—Impeachment by Juror.**

12. Affidavits of jurors will not be received to impeach a quotient verdict, whether made by members of a unanimous jury or by non-concurring jurors under the statute allowing three fourths of the jurors to return a verdict.

> [Misconduct of jurors, other than their separation, for which verdict may be set aside, see note in 134 Am. St. Rep. 1033.]

From Baker: GUSTAV ANDERSON, Judge.

In Banc.  Statement by MR. JUSTICE MCBRIDE.

This is an action by John Spain against the Oregon-Washington Railroad & Navigation Company, a corporation, for damages for the unlawful ejection of plaintiff from defendant's train and for causing him to be wrongfully and causelessly imprisoned. The complaint charges, in substance, that on October 19, 1912, plaintiff was a passenger on defendant's train, and that at the time of the alleged assault he was riding thereon through the City of Huntington; that just prior to the departure of the train from Huntington, in the presence of a large number of persons, the defendant's conductor and other agents wrongfully assaulted and dragged him from the car where he was sitting, ejecting him therefrom with great violence, erroneously accused him of drinking intoxicating liquor and being drunk, to his great shame and humiliation, and without cause occasioned his arrest and incarceration for several hours in a jail which was filthy and infested with vermin and unfit for human habitation; that there was no heat in the jail, and the weather being cold and inclement he suffered intense pain; that his arm had recently been amputated, and that he

was then on his way to consult his regular physician; that the detention in jail and exposure therein caused his arm to become greatly inflamed and seriously worse than when the arrest was made, which together with the loss of medical attention for a period of 24 hours necessitated a second amputation; that by reason of the premises he was compelled to have his business attended to by other persons at great cost, to employ medical attendance, and to undergo an operation which occasioned great pain, worry, loss of sleep, etc., whereby he was injured and further damaged in the sum of $4,000; that at the time of his arrest and prior thereto plaintiff did not drink and had not drunk intoxicating liquors, nor was he at said time in a drunken or intoxicated condition.

To this the defendant answered by a general denial of all the allegations of the complaint relating to the arrest and imprisonment, except as set up in its further and separate answer, wherein it was alleged that at the time of plaintiff's arrest he was upon defendant's car in a state of intoxication, and did then and there, in the presence of the passengers and of a peace officer of the State of Oregon, drink intoxicating liquors upon said car, which was not a dining buffet or private car, but a regular passenger-car, and that said peace officer thereupon arrested plaintiff and placed him in the city jail, restraining him there; that thereafter on the twentieth day of October, 1912, plaintiff was complained of by the city authorities for violation of Ordinance No. 22 by being drunk and disorderly within the city limits, and plaintiff voluntarily entered a plea of guilty to said charge, and thereupon a judgment of conviction was entered against him; that the matters out of which the charge arose and the plea of guilty entered therein by plaintiff are the same inci-

dent complained of in plaintiff's complaint, and that plaintiff is therefore estopped from claiming or asserting the matters therein set forth.

To the new matter stated in the answer plaintiff replied by denials, and a trial was had resulting in a verdict and judgment for plaintiff, which verdict was concurred in and signed by only nine jurors. Upon a motion for a new trial defendant, among other matters urged at the hearing of the motion, produced the affidavits of the three jurors who refused to concur in the verdict rendered, wherein they deposed that the result arrived at was a quotient verdict, determined by each of the nine jurors writing down the amount he believed the plaintiff was entitled to recover and dividing the aggregate of the sums suggested by nine, which quotient it had been previously agreed should stand as the verdict. The motion for new trial having been overruled, the plaintiff had judgment and defendant appeals.                         REVERSED.

For appellant there was a brief over the names of *Mr. Arthur C. Spencer, Mr. James H. Nichols* and *Mr. Charles E. Cochran,* with an oral argument by *Mr. Spencer.*

For respondent there was a brief over the names of *Mr. William H. Strayer* and *Mr. Charles F. Hyde,* with an oral argument by *Mr. Strayer.*

MR. JUSTICE McBRIDE delivered the opinion of the court.

1, 2. The question as to whether plaintiff was intoxicated or drinking intoxicating liquor is foreclosed by the verdict of the jury so far as this court is concerned. If plaintiff and his witness are to be believed, he was

utterly innocent of drinking any intoxicating liquor
and was duly sober; while, on the other hand, several
apparently reputable witnesses testified that he was
not only drinking liquor, but was exceedingly drunk.
The jury evidently accepted the testimony of plaintiff
and his witness, and we must therefore assume that
plaintiff was peacefully and soberly traveling on de-
fendant's train, and that defendant's conductor seeing
him drink ginger ale from a bottle assumed at once it
was beer, and calling a deputy sheriff, who was also a
watchman employed by defendant, to his assistance,
had plaintiff ejected from the train and put under
arrest. If plaintiff was drunk or drinking intoxi-
cating liquor on the train, or if his conduct was such
as to have induced a reasonable man to believe him
drunk, it was not only his right but the duty of the con-
ductor to place him under arrest. To be intoxicated
or to drink intoxicating liquor in an ordinary pas-
senger-car is a crime made punishable by Chapter 135,
Laws of 1911, while Section 6959, L. O. L., declares
that the conductor of a railroad train, while actually
engaged as such, shall have the power of a sheriff in
each county through which the train passes for the pur-
pose of protecting the public peace and arresting vio-
lators thereof on or near such train. Accepting plain-
tiff's testimony as true, as we must after verdict, it
appears that the conductor, without stopping to in-
vestigate or ascertain the contents of the bottle, called
an officer and caused a perfectly sober passenger to be
put under arrest, as a consequence of which he was
incarcerated in a cold and filthy prison, detained from
his business, and suffered slings and arrows of out-
rageous fortune as detailed in the Iliad of his woes
given in the preliminary statement. Whether the con-
ductor acted in good faith was a question for the jury,

and it was fairly submitted by the instruction given by the court.

3-6. It is contended that the court erred in admitting testimony to the effect that plaintiff's companions, who drank with him from the same bottle, were not disturbed by the conductor; but we think this is admissible, both as a part of the *res·gestae* and as showing the good faith of the conductor in making the arrest. The bearing of this testimony upon any phase of the case would necessarily be slight in any event if it had any at all, but, while remote, we do not think it incompetent. The testimony in regard to the condition of the Huntington jail was not improper. If defendant by its agents, the conductor and watchman, unlawfully or maliciously caused plaintiff's arrest and incarceration, it was a continuing tort for the consequences of which the original wrongdoer should be held responsible. The defendant's trespass, if it was one, did not end when the plaintiff was handed over to its watchman, but continued during his incarceration and up to his release. The complaint was drawn upon this theory, and the conditions in the jail are fully set forth as an element of plaintiff's damage. While it is true that the conductor is given by the statute the powers of a sheriff, it is not conceived that when executing the duty of preserving order on the train he ceases to be a servant of his company, or that the statute invests him with any other or different power than that already possessed by him as conductor beyond that of calling upon the bystanders for assistance in making an arrest, which but for the statute he would have no legal right to require. It is impossible to separate the peace officer from the conductor when the duties of both are vested in the same person, and practically the same duty is required in each capacity. "I swear

as a private person and not as a bishop," said a cleric when reproved by the king for profanity. "But," said the king, "if the private person goes to hell for swearing, what becomes of the bishop?" So, if the conductor negligently or willfully assaults a passenger or expels him from the train, what becomes of the peace officer wearing the same skin? The powers given by statute to the conductor are not for the purpose of enabling his employer to escape liability for his acts, but to enable him better to protect its property and passengers from the unlawful acts of others. The same may be said of Rooney, the man actually making the arrest. If, as he says, he saw plaintiff drinking beer on the train and found him on the train drunk, he was justified in arresting him and taking him to jail; but, while he had incidentally a deputy sheriff's appointment, he was nevertheless an employee of defendant and in its service for the purpose of protecting its trains and depots from lawlessness. The deputyship and badge were, no doubt, given him for the purpose of enabling him the more efficiently to perform the duties of his employment. When Rooney, the deputy sheriff, led plaintiff from the train to the street and thence to the jail, Rooney, the watchman of defendant, also led him there, and it was Rooney the agent of defendant, who consented that plaintiff might be charged with a municipal offense instead of a violation of the state law. So that if these employees of defendant acted negligently or willfully in the premises and ejected and imprisoned a sober man who had not violated any law of the state, which fact they might have ascertained by reasonable diligence, the tort was a continuing one including all the discomforts of the jail in which he was confined; and the mere fact that the conductor and watchman were

also peace officers will not relieve the defendant of liability for their tortious acts. Another objection was to the ruling of the court permitting plaintiff to testify as to his sense of humiliation and mortification on account of being publicly ejected from the car. It is well settled that except in cases of slander, breach of promise and the like, a recovery for mental suffering unaccompanied by physical injury will not be permitted: *Adams* v. *Brosius,* 69 Or. 513 (139 Pac. 729, 51 L. R. A. (N. S.) 36). But the same authorities cited in the case last referred to hold, also, that where the tort is accompanied by physical injury mental suffering may be taken into account. In the case at bar the ejection was accompanied with some degree of physical force, and, if this was not justified, it constituted an assault and involved a false imprisonment of the plaintiff. Under these circumstances the testimony was relevant: 19 Cyc. 368.

7. Another alleged error was the ruling of the court permitting one Workman to answer the following question: "What are your habits as to the use of intoxicating liquor?" The witness replied: "I claim to be a good, clean athlete, and I don't drink any liquor." Ordinarily the question would have been irrelevant, though it can hardly be seen how the answer could have affected the case one way or the other; but in this particular instance the witness had testified that he was the person who furnished a bottle of ginger ale from which plaintiff drank and which the conductor claimed to have been beer. Upon cross-examination he was asked where he got the ale, what sized bottle it was in, and how many bottles he had brought with him; the counsel asking him this question, among others: "Was that really ginger ale, or was it a sort of dry-county ginger ale?" The tendency of the cross-

examination was to suggest a doubt as to the truth of the witness' statement that the contents of the bottle he was carrying and from which plaintiff drank were really nonintoxicating. Under the circumstances there was no impropriety in allowing the witness to state that he did not drink liquors as tending to show the improbability of the assumption that he was carrying intoxicating liquor in his grip or drinking it upon the occasion in question.

8, 9. The next objection is that the court's statement of the issues to the jury did not cover all the material issues. Either in the preliminary statement or during the charge the court covered all the material issues made in the pleadings. That presented by defendant in the way of a request for instructions was too lengthy to be of value to the jury, being practically a summary of the pleadings, which the jury had with them and could read for themselves. The fact that the plaintiff pleaded guilty to a charge of being drunk and disorderly in the City of Huntington was not a material averment in the answer, and the denial thereof in the reply raised no material issue; and the record not being of a matter between the same parties is not conclusive either as evidence or as an estoppel. Its sole value is as evidence of an admission contrary to the plaintiff's present contention. This is supported by the following authorities: Freeman, Judgments (4 ed.), § 319; Black, Judgments (3 ed.), § 529; *Young* v. *Copple,* 52 Ill. App. 547; *Clark* v. *Irvin,* 9 Ohio, 131; *Jones* v. *Cooper,* 97 Iowa, 735 (65 N. W. 1000); *Corbley* v. *Wilson,* 71 Ill. 209 (22 Am. Rep. 98). In Freeman, Judgments (4 ed.), § 319, the rule and reason for it are thus stated:

"So a judgment of conviction founded upon a plea of guilty may be received in a civil action as an admis-

sion by the defendant of the facts confessed by his plea; but this is manifestly only a mode of proving such admission, and cannot be regarded as estopping the defendant from showing that notwithstanding such confession and conviction he was not guilty."

To the same effect it is said in Black, Judgments (3 ed.), § 529:

"In the next place, a criminal sentence may be admissible in evidence as a species of admission, although, strictly, it is not proper to be received as *res judicata.* Thus, in a civil action for assault and battery, the defendant gave in evidence, in mitigation of damages, the record of his conviction in a criminal court on an indictment for the same assault and a receipt of the sheriff for the fine and costs of the prosecution. The judge charged that, the record of such conviction having been given in evidence by the defendant himself, it was no longer a matter of doubt that an assault had been committed, and the plaintiff would be entitled to some damages. And herein, it was held, there was no error. On the same principle, if the defendant in a criminal prosecution pleads 'guilty,' the record of such prosecution and plea may be used as evidence against him in a subsequent civil action involving the same subject matter as tending to prove the act or fact on which the indictment was framed. But since it is not the criminal judgment, but the plea, or rather the fact of his having so pleaded, that thus becomes evidence, it is not conclusive upon him. It is receivable as an admission or confession, but it may be controverted, and must be weighed by the jury."

Respectable authority is found supporting a contrary doctrine, but it is believed that the better rule is that herein enunciated. Most of the authorities will be found cited in *Erie R. Co.* v. *Reigherd,* 166 Fed. 247 (92 C. C. A. 590), as reported in 20 L. R. A. (N. S.) 295 (16 Ann. Cas. 459).

10. Other objections as to rulings and instructions of the court are raised, but we consider all of them without substantial merit, save the exception to the instruction of the court submitting to the jury the question as to reinfection of the wound arising from exposure in the jail and the damages caused by reamputation and loss of business. Plaintiff's original injury, as shown by the testimony, occurred early in July, 1912, and was occasioned by his hand becoming entangled in a rope (presumably attached to a horse), whereby his wrist was cut to the bone and all the arteries severed, necessitating the amputation of his right hand at the wrist. The wound never completely healed and continued to discharge pus and pieces of necrosed bone up to the time he started to Boise, about the 17th of October, 1912. Plaintiff stayed at Boise one day and started back the next evening, and was arrested at Huntington about 11 o'clock P. M. of the 19th of October. He states that he had some horses out on the track at Boise which he had leased out, and did quite a lot of running around, and was pretty tired when he got on the train; that there was a spot on his arm which was unhealed and discharging pus, but there was no inflammation, and the arm felt all right until he got to Huntington; that he took cold in the wound in the jail, and it began to swell and got worse; and that finally it had to be reamputated. Workman, the next witness called, stated that when plaintiff got on the train at Boise he was perfectly sober, but said he was tired out, and took a nap once in a while. Mrs. Simms, of Union, testified that she dressed plaintiff's arm when he was starting to Boise, and had dressed it several times before; that it was healing nicely; that there was an unhealed spot about as large as a ten-cent piece from which a little pus exuded at times, but

no swelling or inflammation; that when plaintiff returned his arm was a great deal worse and was running "quite a little bit," and continued to grow worse until the second amputation; that it never at any time after the first amputation ceased entirely from discharging pus.  Dr. Myers, of Union (who is to be distinguished from Dr. Myer, of Baker, who performed the first amputation), was called as a witness for plaintiff, and testified that he saw the plaintiff's arm on July 7th, before the first amputation, but was not present when it was amputated; that he dressed the wound frequently in August and possibly for the last time early in September, though he hardly thought he did so at so late a date as that; that several small pieces of necrosed bone came from the wound, and it was still discharging some pus the last time he dressed it, which indicated some kind of infection; that at that time he advised plaintiff not to have the arm reamputated for a while, believing that when all the dead bone came out it would heal of itself.  He was then asked these questions on direct examination:

"Now, doctor, assuming that on the 16th or 17th of October, 1912, Mr. Spain's arm had healed over with the exception of a spot about the size of a dime which was scabbed over and occasionally some pus would come from that, but there was no indication of swelling or inflammation; and further assuming that on the twentieth day of October, or about three days later, this scab on the end of his arm was inflamed, swollen, and sore—what would that, in your opinion as a physician and surgeon, indicate?

"A. It would indicate it was reinfected from some source or another; that might indicate a lack of drainage, the drainage might have got stopped.

"Q. One or the other, or both?

"A. Yes, sir.

"Q. You say it might indicate it had been reinfected?

"Yes, sir.

"Q. In what way would it be possible to reinfect it?

"A. It might be externally from getting in contact with the dirt, or it might get reinfected through manipulation of any kind that would cause a scattering of the infection already present.

"Q. Assuming he had been handled with more or less violence to the extent of loosening and removing the bandage so either it might have become reinfected or added infection arise from that cause?

"A. That would depend upon whether the wound was actually hurt or not at the time from an internal standpoint, and, if the bandage was removed from an external standpoint, it would probably be reinfected externally.

"Q. Explain to the jury how this would get infected by a removal of this bandage.

"A. That could be done simply by getting external dirt into the wound. Dirt is infectious that has not been sterilized.

"Q. What do you mean by a scattering of the infection?

"A. If you have a pocket of pus, for instance, there is a granulated tissue will grow that will envelope the pus; if you get that injured so it breaks up that granulated tissue, then the infection will travel into new uninjured tissue.

"Q. What would bring that about?

"A. By rough usage of any kind.

"Q. Would it require very rough usage to do it?

"A. That depends on the stage of the granulation."

In answer to questions propounded on cross-examination, witness stated that, if the wound was unhealed and discharging pus on the 17th of October, the same condition would probably continue until the 20th; that if the dressing applied was not surgically clean, that is, was not sterilized, the dressing itself might cause

infection; that a virulent infection might manifest itself in 24 hours, while a more simple type might run 4 or 5 days and then manifest itself very suddenly. Now, from this testimony, which is wholly from plaintiff's witnesses, there may be drawn several inferences: (1) That the inflammation which ensued upon the 21st was a mere phase of an infection already shown to exist in the wound; (2) that it arose from plaintiff's activities around the race-track at Boise; (3) that it came from unsterilized dressings applied by Mrs. Simms before plaintiff's departure to Boise; or (4) that it arose from unsanitary condition existing in the jail at Huntington. There is no evidence which has a tendency to show from which of these causes the subsequent aggravated condition arose. It might have been from any one of them, or, if there exists any reason to differentiate, the first of the possible causes would seem the most probable, as there can be no question under plaintiff's own testimony but that some infection resulting in a discharge of pus existed at the time he left for Boise. That his arm was not in an entirely satisfactory condition while at and returning from Boise is shown by his complaint, which alleges that he was "suffering from a recently amputated arm and was then on his way to consult his regular physician." When the evidence leaves the case in such a situation that the jury will be required to speculate and guess which of several possible causes occasioned the injury, that part of the case should be withdrawn from their consideration: *Armstrong* v. *Town of Cosmopolis,* 32 Wash. 110 (72 Pac. 1038). So far as the wrongful arrest, detention and imprisonment, and the filthy condition of the jail, are concerned, the plaintiff made a case sufficient to go to the jury; but the court should have withdrawn from their consideration

the subject of the effects of these acts upon the condition of plaintiff's arm as constituting an element in plaintiff's recovery.

11, 12. There is one other objection urged to which, as it involves a question of general interest, we will advert. This is the attempt by defendant to show by the affidavit of three dissenting jurors that the verdict was arrived at by taking the aggregate of each juror's estimate of damages and dividing it by nine; the quotient thus obtained having been previously agreed upon as the amount that should stand as a verdict. It has been so often held a quotient verdict is illegal that a citation of authorities on that point is unnecessary. Neither is it necessary to cite authorities to the effect that the affidavits of jurors will not be received to impeach such a verdict. The distinction attempted to be made by counsel between affidavits made by jurors where a unanimous verdict is required, and cases where the affidavits are made by nonconcurring jurors under statutes such as ours, where three fourths of the jurors may return a verdict, finds no support in the authorities. The rule is the same in either case: *Marvin* v. *Yates,* 26 Wash. 50 (66 Pac. 131); *Saltzman* v. *Sunset Telephone & Telegraph Co.,* 125 Cal. 501 (58 Pac. 169).

For the error heretofore noted, the judgment is reversed and a new trial directed.

REVERSED AND REMANDED.