Argued March 2, reversed and remanded April 24, 1928.

## EMIL RONNER, Administrator, *v.* BEKIN'S MOVING, STORAGE AND HOUSEHOLD SHIPPING CO.

### (266 Pac. 627.)

**Appeal and Error—All Relevant Testimony must be Assumed True in Passing on Granting of Motion for Nonsuit.**

1. In determining propriety of granting motion for nonsuit, appellate court must assume that all relevant testimony is true.

**Negligence—Jury will not be Permitted to Speculate as to Cause of Injury Where There are Several Causes Which may have Produced Injury.**

2. Where there are several causes which may have produced the injury by reason of which suit is brought, and there is nothing in the evidence to indicate which one was the most likely, courts will not permit jury to speculate and bring in a verdict as a result of such speculation.

**Automobiles—Whether Death Resulted from Injuries Received in Automobile Collision Held for Jury Under Evidence.**

3. In action for death from collision between automobile and defendant's truck, evidence that death of deceased was result of injuries received in collision *held* sufficient to take case to jury.

Appeal and Error, 4 C. J., p. 763, n. 59.
Death, 17 C. J., p. 1306, n. 90, p. 1309, n. 32, p. 1311, n. 49.
Evidence, 22 C. J., p. 667, n. 54.

From Multnomah: Walter H. Evans, Judge.

Department 1.

This was an action brought by the administrator of the estate of Babette Ronner, deceased, to recover damages for injuries which it is alleged were caused by a collision between a truck owned and driven by defendant's employee and an automobile driven by a son of deceased.

There was evidence of the negligence of defendant's employee which was sufficient to take the case to the jury so far as that particular branch of it was concerned. There was also indisputable evidence

that, by reason of the collision, plaintiff's intestate was very severely injured, and that within about a week after the injury she died in the hospital at Portland.

The defendant contended that there was no evidence tending to show that the injuries received by deceased in the collision were the cause of her death, and at the conclusion of the testimony moved for an involuntary nonsuit, which the court granted upon the ground above stated.   From the subsequent judgment of dismissal plaintiff appeals.

REVERSED AND REMANDED.

For appellant there was a brief over the names of *Mr. Walter C. Winslow* and *Mr. Carey F. Martin,* with an oral argument by *Mr. Winslow.*

For respondent there was a brief over the name of *Messrs. Winter & Maguire,* with an oral argument by *Mr. Robert F. Maguire.*

McBRIDE, J.—1. There is one sole question upon which the court granted a nonsuit and the only question which we are called upon to consider here is: Was there any substantial testimony introduced by the plaintiff from which a reasonable jury would be justified in finding that the death of the deceased was the result of the injuries received in the collision? In considering this question we must assume, for the purpose of discussing the motion for nonsuit, that all relevant testimony is true, and we have recounted the substance of such testimony, taking first that of the lay witnesses, and, later, that of the expert.

Emil Ronner, Jr., testified, in substance, that at the shock of the collision his mother fainted; that

they drove the car with her in it to the residence of a physician near by, but finding him away drove to Mrs. Sam Palmer's house several blocks away; that when they got there she was "real bad," still groaning and in a semi-conscious condition, and that she remained at Palmer's from Saturday night until the next Friday, when she was taken to the Emanuel Hospital, where she remained until the following Monday about 11 o'clock, when she died.

Mrs. F. W. Lehman, a daughter of the deceased, who was in the car with her at the time of the accident, testified that her mother was a very healthy woman, who had not been sick enough to have a doctor for twelve or thirteen years; that she was struck in the side at the time of the accident and suffered severely; that she was taken to the house of a friend where a doctor was called, who bandaged her ribs and gave her a lotion for bruises upon her body; that she was not able to lie down at any time but had to be propped up in a sitting posture with pillow and cushions; that her abdomen was swollen to nearly twice its natural size, and that the accident happened on the 15th of May and the deceased died in the hospital on the 25th of May, never having been able to lie down during that interval. She testified that "she never could lie down no more. * * She just suffered everywhere." The whole cross-examination of this witness left her testimony unshaken as to the fact that at the time of the accident deceased was in fairly good health.

Mrs. Palmer testified as to the condition of the deceased immediately after the accident and up to the time of her death, her testimony being similar to that of Mrs. Lehman's.

The husband of deceased testified as to her comparative good health up to the time of the accident. The whole testimony on this point indicated that deceased was in fairly good health up to the very moment of the accident; that thereafter she suffered intensely as above detailed, and that on the ninth day after the accident she died.

Dr. Chick, the physician who attended deceased, was not called as a witness and beyond the statement of counsel for plaintiff during the trial that "he had left" we have no reason why he was not called.

The body was taken to Salem and buried and on June 6th it was exhumed and an autopsy conducted by Dr. Frank R. Menne, who was accompanied by Mr. Gulbranson, deputy coroner of Multnomah County. Doctor Menne, whose qualifications for the service would appear to be of a high order, testified that he found the ninth and tenth ribs broken; that the spleen was ruptured with a large blood clot lying between the spleen and stomach and some free blood in the abdominal cavity, and that in the rear of the lower part of both lungs were some spots of pneumonia which he called "bronchial pneumonia." The doctor stated, that in his opinion, the conditions were the result of an injury. Among other matters, he was asked if he could tell what the cause of the bronchial pneumonia was which he discovered from his examination. He answered that he thought he could, and over objection of defendant testified as follows:

"A. The rupture of the spleen, of course, results in bleeding and the loss of blood, and also, because of its connection, results in what is known as shock. Both the loss of blood and the shock would tend to lower the resistance of the individual, and probably did in this case, with the result that pneumonia, which

is known and well recognized as a terminal type of pneumonia, will develop—terminal because it occurs in the most dependent portions of the lung.

"The Court: By 'dependent' you mean the lower portion?

"A. The lower—the lowest portions, where blood will naturally sink because of its physical properties, and where there will tend to be a congestion or an accumulation of blood. It is here the organisms are capable of beginning disease processes, and that is practically what occurred here.

"Q. * * Well, how is the bronchial pneumonia there that you found a cause of the death, or an incident to the death,—the injury? * * A. It is considered a factor in the death, the final factor.

"Q. * * And what is the cause of pneumonia? A. Well, there are various causes of pneumonia, depending upon the type.

"Q. Take this particular type that you found. A. Well, there are a variety of bacteria or germs that may cause such pneumonia. Do you wish me to enumerate them? They are technical terms.

"Q. Well, what I am trying to get at is whether it is ever caused from shock and injury? A. Not alone, the shock and injury is simply a contributing factor which lowers the resistance and permits germs that are already present to enter.

"Q. Well, then I wish you would describe the nature of this germ or germs generally, there, Doctor, so we will have just a brief understanding of it—I don't care to go into the subject in its broadest sense—so that we will have clear how the injury adds to that condition that is there to get the result that you have referred to. A. Well, there are various germs in the nose and throat and in the windpipe, and all of its branches, at all times, but under ordinary conditions these germs have no power to get through the lining, but when the resistance of the body is lowered by some injury, or by bleeding, or a variety of conditions, then the—especially by direct injury, they are able to penetrate the lining of the

windpipe and get into the tissue, where they multiply and produce a characteristic which we recognize grossly and microscopically as pneumonia.

"Q. In other words, if I understand you, then we might any of us have these germs in our system, but with normal resistance they would have no effect? A. Yes, sir.

"Q. But by lessening the resistance they would be effective.   A. Yes, sir."

The following also occurs in the course of the testimony of this witness:

"Q. Now, what would be the effect of a rupture of the spleen, such as you found in this case?   A. Well, my conclusion in that is, that the rupture was sufficient to cause death.

"Q. Then your conclusion, as I understand you, Doctor, is that the cause of the death of Babette Ronner was the injury to the spleen, the ruptured spleen that you have referred to.   A. The ruptured spleen caused the final pneumonia."

The witness was subjected to a searching technical cross-examination in respect to the various phases of pneumonia, but this examination, in our opinion, in no way shook his contention that the pneumonic indications, which he observed, were the result of the physical injuries which the autopsy disclosed.   The physical appearance of the deceased, mentioned by the doctor, was corroborated to a great extent by the testimony of Mr. Gulbranson the deputy coroner, who, while not a physician, appears to have been capable of noting the general appearance of the body.

At the close of plaintiff's case, we have in substance the following conditions: 1. Sufficient evidence of the negligence of defendant's employee to go to the jury. 2. Evidence, almost irrefragable, that deceased met with very severe injuries as a result of the collision.

3. That before and up to the date of the collision, she was a strong and fairly healthy woman.  4. That from the time of her injury to the day of her death, more than a week later, she suffered great pain continually; that her abdomen was swollen to nearly twice its natural size and that finally she died.  From this testimony alone the average juror, pursuing a logical course of reasoning, might well be satisfied that her death was the result of the injury.  But, in addition to this, we have the testimony of an apparently capable surgeon that the autopsy disclosed two broken ribs, a ruptured spleen and a pound or more of clotted blood in the lower cavities of the body.  He was not testifying from the history of the case, detailed to him by others, but from physical facts coming under his own observation and these convinced him in the exercise of his expert knowledge, as they would convince any person of common sense, that the lesions were the result of force applied to the body.  From this knowledge he was able to say that, in his opinion, these injuries would naturally produce a shock and weakening of the vital forces, which, being thus weakened, would naturally be unable to resist the pneumonic germs which, whether they were dormant in the body before the injury or lodged in it afterwards, were the final agents in the chain of causation which resulted in the death of the injured woman.

2, 3. It is true that where there are several causes which may have produced the injury, and there is nothing in the evidence to indicate which one is the most likely, the courts will not permit the jury to speculate and bring in a verdict as a result of such speculation.  Such a case is *Spain* v. *Oregon-Wash-*

*ington R. & N. Co.,* 78 Or. 355 (153 Pac. 470, Ann. Cas. 1917E, 1104), in which plaintiff sought to obtain damages by reason of having been wrongfully imprisoned in an insanitary jail whereby he claimed that an injured arm became infected. There was no evidence to connect the cause of infection with the condition of the jail either by experts or otherwise, and in fact there was evidence that there was some degree of infection before the plaintiff was imprisoned, and there were circumstances indicating that the later infection might have been caused by any one of the several causes equally as plausible as the imprisonment. The physician called by plaintiff in that case was unable to designate the particular cause or to differentiate between possible causes. Here the case is different. There is a logical chain of circumstances leading up from the injury to the death, and an apparently competent expert is practically positive that the death was the result of injuries, which other testimony tends to indicate, were inflicted by the negligence of defendant's employee.

In a case of this character it would be unjust, in any event, to confine the evidence to a diagnosis made by the attending physician to whom perhaps only an autopsy made, after his services had ceased to be useful to his patient, could disclose the real extent of the injury.

We are of the opinion that the nonsuit was not properly granted and that defendant should have been required to submit its case to a jury. Of course, we are not now expressing our opinion upon the weight of plaintiff's evidence. It may well be that upon a trial of the controversy upon the merits, the plaintiff's contentions may be negatived by the pre-

ponderance of the testimony, but assuming as we must upon the motion for nonsuit that every word of testimony introduced by plaintiff is true, it seems to us evident that there was some evidence to sustain plaintiff's contention.

The judgment will be reversed and a new trial directed.                                    REVERSED.

RAND, C. J., and COSHOW and BROWN, JJ., concur.