## WHITE v. BURTON.

No. 26108. June 8, 1937.

Rehearing Denied Sept. 21, 1937.

Gibson, Maxey & Holleman, for plaintiff in error.

Searcy & Underwood and Hickman & Ungerman, for defendant in error.

BAYLESS, V. C. J. Geraldine Burton, a minor, through her father and next friend, C. A. Burton, instituted an action in the district court of Tulsa county, Okla., against Dr. N. Stuart White, to recover damages for alleged serious and permanent injuries she received as the result of certain alleged acts of malpractice. From a judgment in her favor, the defendant appeals.

The defendant advances 14 grounds, some of which are subdivided, for a reversal of said judgment. At least six of these relate to the main issue, and will be considered together. This contention may be summarized thus: There was a total absence of competent medical testimony to attribute the failure of plaintiff's leg to heal to a lack of care or skill in diagnosis and treatment by the defendant, or, to put it another way: The overwhelming and uncontradicted evidence is that plaintiff's ununited fracture of the tibia is the result of a congenital condition and a systemic deficiency, and that no amount of care, skill, or treatment would have produced any better results. The defendant contends that he diagnosed the plaintiff's injury properly, and that he treated it with a skill commensurate with his professional ability and responsibility. It is proper at this point to summarize the evidence and indicate wherein it is or is not in conflict.

The plaintiff jumped from her high chair when she was about 21 months old. Thereby she injured her left leg. This happened at night, and defendant was called to see her. The parents testify that defendant came to visit plaintiff while on his way to a party and only made a cursory examination and pronounced the injury to be a sprain. Defendant denies this, and testified he made as much examination as was possible, prescribed treatment, and called the next morning when he thought the leg could be better examined and treated. Plaintiff was taken to the hospital, where defendant reduced the fracture and had her leg X-rayed. The parents testified defendant told them the fibula or small bone was broken, that such bone was of small consequence to humans, and it would heal in due course and without trouble. The X-ray, which defendant did not then examine, showed a fracture of the tibia, and not of the fibula, and a good setting thereof. All physicians testified that the reduction of the fracture showed good apposition of the ends and good alignment. Defendant denies he said the fibula was broken, and insists he knew it was the tibia. The X-ray bears him out in this, and he insists it was not necessary for him to examine the X-ray, since a child's limb is small and manual examination is sufficient. After four or five weeks, defendant removed the cast and advised the parents to have plaintiff walk on the leg. He made no X-ray at the time. Plaintiff refused to walk, and after some lapse of time defendant put a new cast on the leg. This procedure of applying and removing casts lasted for months. The parents testified that during all of this time defendant said plaintiff's fibula was making satisfactory progress. Defendant testified he knew the child was suffering from rickets and that the bone would not unite for this reason, and, further, that he advised the parents to consult a specialist for that condition. Defendant made no effort to treat her therefor. The injury was sustained May 21, 1931. In January, 1932, the defendant had a second X-ray made. The parents testified that at that time defendant admitted to them he had labored under the impression the fibula was broken, and now this X-ray showed the tibia broken instead, he could and would fix that. Defendant emphatically denies this. Within a short time defendant and another doctor operated on the plaintiff's leg by cutting into the bone. They discovered some callus, scraped the ends of the bone, and inserted a beef bone peg to maintain apposition and alignment. Their testimony was that not enough serviceable callus had formed to produce a union. During this operation the fibula was broken, and apparently no attempt was made to treat it. The theory was that the fibula was causing an adverse effect upon the tibia and causing the leg to bow. This treatment did not produce a union and the beef bone peg slipped down into the medullary canal of the lower portion of the bone. Thereafter defendant again operated upon the plaintiff's leg, and removed the beef bone peg, rescraped the ends of the bone, and sutured

them together. This did not produce a union. The parents thereupon took the child to Mayo's, where a homogenous graft (using a portion of bone from the father's leg) was performed. This operation did not succeed, although the bone graft did unite to the upper end of the tibia. We have pointed out herein where competent evidence of the parents conflicted with the evidence of defendant as to the diagnosis, early treatment, and later diagnosis. We do not mean that the parents' testimony was of a scientific character, but it was recitation of what defendant told them—all of which defendant denied.

The most serious aspect of plaintiff's condition is this permanent nonunion. Consequently, the most serious question is whether it is in any wise attributable to defendant's diagnosis and treatment. This issue, under our decisions, is one to be determined upon medical testimony. Inter-Ocean Oil Co. v. Marshall, 166 Okla. 118, 26 P. (2d) 399, and other cases. Therefore, our decision upon the arguments embraced under this contention turns upon the testimony of the various physicians.

The defendant was supported in the correctness of his diagnosis, the propriety of the treatment given by defendant to plaintiff, and in his contention that the permanent nonunion resulted from the congenital condition of the bones and the presence of rickets, by the positive testimony of ten other physicians. Several of these physicians had treated plaintiff, and all of them had made some examination of her. At least four of these physicians testified that an examination of the various X-ray pictures of plaintiff's leg demonstrated the congenital condition of the bone and the existence of rickets. All of these physicians testified positively that the permanent nonunion resulted from the failure of the plaintiff to produce the callus substance necessary to form a union and that this resulted from the congenital condition of the bone and the rickets; and all denied that this permanent nonunion resulted from any failure of diagnosis or treatment. It is difficult to conceive a stronger defense in this respect. Even the eminent bone specialists at Mayo's Hospital, who treated the plaintiff at the request of her parents, and whose deposition was taken by the plaintiff but introduced by the defendant, unqualifiedly supported the defendant's theory and defense.

But, however positive and strong this defense is, it is not uncontradicted, and, therefore, was a question for the jury.

The plaintiff's testimony on these points was embodied in the depositions of two physicians. It may be said at this point that these physicians never examined or treated the plaintiff. This does not render their testimony incompetent, but would go to the weight thereof. This is for the jury. Under the strenuous argument of the defendant that the testimony of these physicians does not conflict with the testimony of his expert witnesses, we deem it advisable to point out wherein it does conflict.

(1) These physicians criticize the defendant for not reducing the plaintiff's fracture immediately, and for waiting until the next day as he did; (2) they criticize defendant for not keeping the bone fragments in a continuous and satisfactory alignment and apposition; (3) they criticize him for not taking X-ray pictures with more frequency, whereby he might have studied the alignment, the apposition, the formation of callus and other details of healing, and might thereby have known positively of the failure of a union and to have taken steps to bring it about; (4) they criticize defendant for failure to have made analyses of the blood by which constitutional deficiencies might have been determined accurately and treated; (5) they criticize the cast applied (one of them saying that splints was the proper treatment for a child); (6) they condemn the insertion of the beef-bone peg in view of its size, saying that it was bound to act as a foreign body and to irritate the plaintiff's leg and to interfere with the functions of the medullary canal, and especially do they attribute deleterious effects to permitting the peg to slip out of place and into the lower fragment and remain there for some time. Both of these physicians said it was apparent from an examination of the X-ray pictures that no proper and normal and continuous apposition of the fragments was maintained. Dr. Shaw was asked to what he attributed the nonunion, and he said: "The long period of severance and the lack of union where nutrition can take place." He likewise said as many as three times that the X-ray pictures did not indicate any constitutional causes for the leg not healing. This positively contradicts the testimony of the physicians for the defendant whose readings of the same X-ray pictures indicated the presence of such constitutional causes. Dr. Henning testified that from an examination of these X-ray pictures, there was evidence of vitality in the bones at all times, and that there was evidence of vitality in the upper fragment following the

bone graft at Mayo's Hospital. In answer to at least five questions on direct and cross-examination, he said that the X-ray pictures indicated nonunion, due to lack of apposition and to irritation by foreign body and to irritation caused by the ends of the fragments rubbing due to the lack of fixation and apposition. We have come to the conclusion that the effect of the testimony of these physicians is to raise a conflict with the testimony of the physicians testifying for the defendant in respect to the cause of the permanent nonunion. Criticism is made of the form and contents of many of the hypothetical questions put to plaintiff's medical experts. This criticism is merited, but it does not follow that these physicians failed to deny the existence of the alleged congenital and rachitic conditions. We are of the opinion that the testimony of plaintiff's physicians was of sufficient probative value to support a finding by the jury that the defendant did not diagnose and treat the plaintiff in keeping with the medical standards of the community, and that the failure to obtain a union of the fractured bone was the result thereof, rather than any deficiency in plaintiff's physical self.

Defendant has two contentions upon which he bases claims of prejudice. The first relates to the introduction of incompetent evidence, and the second to improper argument to the jury by one of plaintiff's attorneys. The incompetent evidence was inadvertently admitted at a time when the court was admitting testimony of the father of conversations he had with another physician and repeated to defendant and the defendant's comments thereon. Plaintiff's counsel readily conceded the incompetency of certain statements which the father made, and the court more than once strictly admonished the jury to ignore such statements. The argument of the attorney for plaintiff was violent and full of strong and expressive terms not customarily used in presenting a client's cause to a jury. Such argument to a jury was improper. Our object is to say whether prejudice to the defendant resulted from these. In our opinion it did not. We do not believe the incompetent evidence was of a character to produce prejudice, and, in any event, not to the extreme degree claimed. The language and argument of the attorney appear to us to be more calculated to repel than produce sympathy. There is one thing above all others which convinces us that no prejudice resulted to defendant from these things, and that is the amount of the verdict. The plaintiff, a small girl, has a deplorable, life-long physical handicap. This alone is capable of eliciting strong sympathy. Candor compels us to say that the testimony of plaintiff's witnesses of the long continued, unavailing efforts to produce healing, under (as they say) a course of misapprehension of the real trouble and wasted time and effort, is strongly appealing to the sympathies. Yet, in the face of all this, the jury's verdict was for $7,500. Every day juries return, and this court approves, verdicts for far larger sums under fact situations no more harsh, and oftentimes even less so, than this. We are unable to see any prejudicial results to defendant.

We see no abuse of discretion in refusing a continuance in order to enable defendant to produce Dr. Dixon. The jury understood that witness Burton was undertaking merely to repeat certain conversations, and the plaintiff's attorneys admitted to the jury that if Dr. Dixon was present, he would deny making such statements.

Likewise, we see no abuse of discretion in permitting plaintiff to amend her petition. The amendment related to the descriptive location of the fracture. It is true that defendant had objected to the plaintiff's evidence locating the fracture elsewhere than as described in her petition. But the defendant had introduced evidence corroborating plaintiff's evidence, and in truth there was no dispute in the evidence over the location (that is, in points of distance) of the fracture.

The instruction complained of might, if standing alone, be susceptible of the interpretation defendant argues it has. However, we do not believe the jury could get the impression from it that defendant would be liable if he expressly warranted a cure and then failed, to the extent of excluding the inferences from the record and ignoring the other instructions.

The contentions that errors were committed in admitting certain evidence, and in permitting certain hypothetical questions, would not, if entirely true, work a reversal of the cause. All of this evidence was upon technical medical matters. The objections are largely technical, and such as may be found in the record of every contested action. We have given this record much consideration and cannot believe the errors urged by defendant were in any wise to his damage. We say again we think the amount of the verdict is supported by competent evidence, and, above all is moderate.

**Judgment affirmed.**

OSBORN, C. J., and PHELPS, CORN, and HURST, JJ., concur. BUSBY and WELCH, JJ., dissent. GIBSON, J., not participating. RILEY, J., absent.

BUSBY, J. (dissenting). I cannot concur in the conclusion announced by a majority of my associates. As I view this case, the error of the result announced lies in the analysis of the evidence and the probative force given to the opinion evidence of expert witnesses.

A child of tender years has a broken leg, the disconnected bones of the lower limb having failed to unite after long and unsuccessful surgical treatment. Her condition presents a strong claim to sympathy which is calculated to divert the mind from the impersonal rules of law and the dictates of balanced justice by which our judgment should be guided. She, through her father as next friend, is, in this litigation, seeking to attribute her present unfortunate condition to the failure of the physician and surgeon who first treated her to exercise ordinary care in the treatment administered.

Her case was tried to a jury in the district court of Tulsa county and resulted in a verdict and judgment in her favor for the sum of $7,500, from which the surgeon, N. Stuart White, appeals.

The majority opinion declares, and I agree, that the serious question in this case is whether plaintiff's **condition of permanent nonunion of the bones** of her leg is in any wise attributable to alleged negligence on the part of the defendant in diagnosis and treatment of plaintiff. The majority opinion rightly declares that the issue thus drawn is one of fact, and that the nature of the fact, that is, the cause of the nonunion, is such as to require the testimony of skilled and professional men. Since the case is one at law for the recovery of money, and the issue one of fact, our task ends if in reviewing the evidence there is in the record before us any competent proof tending to establish, first, negligence on the part of the defendant; second, a causal connection between that negligence and the condition complained of by the plaintiff.

On the question of whether there was negligence in the diagnosis or the manner of treatment, eight doctors, including those who had personally examined and treated the child, testified, in substance, that the treatment administered, as outlined by the defendant and corroborated by the observation of others, was in accord with established practice in the surgical world. Opposed to this testimony, two doctors who had never seen or examined the patient testified, in substance, in response to hypothetical and general questions, that the treatment administered was not in accord with the best practice and did not constitute the exercise of proper care.

Bearing upon the question of primary negligence, the plaintiff also introduced proof to the effect that the defendant surgeon did not treat or diagnose the patient's injury in the exact manner described by him. There was thus some conflict in the evidence as to the correctness of the preliminary or first diagnosis and the precise treatment administered, as well as a dispute upon the propriety and appropriateness of the treatment.

While the great weight of the evidence on these matters, especially the medical testimony, favors the defendant, I conclude, as do my associates, that there was sufficient evidence of primary negligence to go to the jury, if that issue alone were determinative of the result. But it is not. The fatal weakness of plaintiff's case lies in the absence of competent evidence to establish a causal connection between the alleged negligence and the result complained of.

The two doctors who appeared as witnesses for the plaintiff testified, in substance, in response to hypothetical questions, that had a different treatment been administered, there would have been a union of the bones. But the hypothetical question which called forth this opinion evidence **assumed a normal child as the patient,** and failed to take **into consideration the undisputed fact** that there existed in this particular patient a congenital condition which, independent of the treatment administered or the diagnosis made, prevented a union of the broken bone.

I am aware that this court has, and I believe rightly so, been very liberal in approving the discretion of trial courts in the form of hypothetical questions permitted to be used in the trial of cases. Chicago, R. I. & G. Ry. Co. v. Bentley, 43 Okla. 469, 143 P. 179; Shawnee Gas & Elec. Co. v. Hunt, 32 Okla. 368, 122 P. 673; Mead Brothers, Inc., v. Watts, 135 Okla. 23, 273 P. 207. And it is not essential that a hypothetical question embrace all of the facts proven. Chicago, R. I. & G. Ry. Co. v. Bentley, supra. However, the probative value of the conclusion announced in response to a hypothetical question depends upon the facts embodied in the question. Thus the testimony of the

504

plaintiff's medical witnesses to the effect that there would have been a union of the broken bones in a child if the treatment outlined by them had been administered cannot be taken as having any probative weight in .this case if in this case it is established by uncontradicted evidence that a congenital condition existed which prevented the union. This absence of probative effect is due to the fact that the existence of such a condition was not suggested as delineated in the hypothetical question asked of plaintiff's medical witnesses.

On the other hand, the doctors who had personally examined plaintiff were all certain that such a congenital condition did exist in this particular case, and that it prevented the union of plaintiff's broken bones. They were also certain that even if a different treatment had been administered, the union would have failed.

In an effort to remedy the condition, this child plaintiff was sent to Mayo Clinic. Dr. Melvin S. Henderson, an outstanding authority and bone specialist, had charge of the treatment there administered. His testimony, brought into this case by deposition, is illustrative of the undisputed medical testimony to the effect that this child was suffering from a congenital condition which prevented union of the broken bones. I quote in part:

"Q. What was your diagnosis of the case? A. Our diagnosis was nonunion of congenital origin of the left tibia and fibula. Q. Will you explain the term 'nonunion of congenital origin'? A. We use the term 'congenital' meaning that the child was born with something abnormal about the left tibia. The history as we obtained it showed that there had been some bowing of the tibia noticed about the twelfth month. Q. You were in consultation with Dr. Helmholz? A. Yes, I saw the child. Q. Could you state in simple terms what your explanation of the condition was? A. I believe that this fracture was due primarily to congenital defect in this child's tibia. Q. That is to say, a defect existing from birth? A. Yes. Q. What would the nature of that defect be? A. The exact nature of the defect we do not know any more than we know what causes clubfeet and other malformations, but we do know this type of fracture I am describing occurs as a result of congenital malformation or disease. or whatever you choose to call it, in the bone. A contributing factor is trauma but the primary cause is the condition of the bone. Q. By trauma you mean injury? A. Yes. Q. Does this type of fracture occur in a normal tibia with a history of a fall such as was given you? A. No, it does not."

And:

"Q. Now, doctor, at the time the child came to you, you stated you found a condition of nonunion. I am not certain that I asked you whether, based on your examination of the child at that time and on the history given you by her parents, you had an opinion as to the cause of the nonunion. Have you such an opinion? A. Yes. Q. What is your opinion? A. My opinion is that this was an ununited fracture, or, as we call it, nonunion of infancy of the congenital type. The fracture was at the juncture of the middle and lower third of the left tibia, which is the usual site for this type of non-union."

And:

"Q. In the ordinary course of events, if the graft was to unite at both ends, would it have done so in that period of time, doctor? A. Yes. Q. Did that indicate to you as a surgeon anything in regard to the reduction for nonunion? A. Yes. Q. What did it indicate? A. It indicated to me that we were dealing with a congenital type of nonunion that I know from experience to be very resistant to all treatment."

And:

"Q. Regardless of the prior treatment and whether it was the best treatment in the world or not, in your opinion, doctor, would this particular type of fracture have resulted in nonunion? A. **In my opinion this type would result in nonunion in spite of any treatment.**"

The positive opinion of this doctor as given in the answer last above quoted is in line with all other medical testimony in this case. It is undisputed. The hypothetical questions which plaintiff's counsel asked their medical witnesses, who did not examine the child, did not (as I have previously pointed out) include the important element of a congenital condition.

This deficiency in the medical testimony produced was recognized by one of plaintiff's own doctors, who wrote the following letter relative to the testimony given by him in the depositions. The letter was admitted in evidence and reads:

"Oklahoma City, Oklahoma.
"March 31, 1934

"Searcy & Underwood Attys at law
"Exchange National Bank Building
"Tulsa, Oklahoma.

"Dear Sirs:

"This is to advise you that I have just completed the reading of the deposition, recently taken in Oklahoma City in the case of Geraldine Burton v. Drs. White and McDonald, and after due consideration I have come to the conclusion that not having had an opportunity to see and examine the patient (plaintiff) in person, and not having

a complete history of the case, I have decided that an injustice might be done the defendants if the deposition should be used in the case. To further illustrate, certain questions were asked me by counsel for the defendants, for example: if I knew that a transfusion for anemia had been advised for Geraldine Burton; if I knew that a specialist had been consulted for her concerning rickets; if I knew that she had been confined in a hospital prior to the injury. As the records stand, these questions are uncontradicted. If they are true, this would change my opinion in the case. There are some errors in the record which I have not taken the time to correct, as I am returning the deposition to Mr. Redrick unsigned. I do not desire to have the deposition used under the circumstances. Respectfully submitted, C. C. Shaw, M. D. Copies to Dr. White Dr. McDonald."

The opinion evidence of the plaintiff was therefore wanting in probative force necessary to present a conflict in the evidence as to a causal connection between the alleged negligence of the defendant and the present condition of the plaintiff of which complaint is made.

Dealing with a somewhat analogous point in Ballaine v. Drake, 98 Okla. 217, 224 P. 947, we said in paragraph 1 of the syllabus:

"In order to recover damages from a physician or surgeon for want of proper care and skill, the burden is upon the plaintiff to show: First, that the defendant was unskillful or negligent; second, that the injury complained of was produced by his want of skill or care."

And in the body of the opinion we stated:

"In order for the plaintiff to recover in this case it is absolutely essential to be shown that two conditions existed: First, that the plaintiff suffered legal detriment and damages; second, that such detriment or damages is not referable solely to the accident with which she met. But it must be shown on her part that considering the accident which she suffered, and the defendant's employment as a physician, she is left in a worse condition than she had a right to expect. There is nothing in the evidence tending to show that any character of treatment would have effected a cure of this arm, or that any mode of treatment would have procured better results. It is true that upon the trial she proved that the arm was useless, but there was no attempt to show that this condition was due to the lack of skillful treatment or that there was any treatment known to the science of medicine or surgery that would have relieved the situation. In the last analysis the plaintiff's case amounts to this: she received the injury, employed a physician, and failed to recover. The jury could not say from the

evidence in this case whether the condition of the plaintiff's arm was due to the character of the injury, or to the want of skill and care in treating it. And as said by Judge Taft in Ewing v. Goode, 78 Fed. Rep. 442: 'If there is no injury caused by lack of skill or care, then there is no breach of the physician's obligation, and there can be no recovery.'

"In order to recover damages from a physician for want of proper care and skill, the plaintiff has the burden of showing that the defendant was unskillful or negligent and that the injury complained of was produced by such want of skill or care. In the case at bar there is a total failure of any evidence tending to show that the plaintiff has suffered injury by reason of the alleged negligence or want of skill on the part of the defendant. From the conclusion we have reached it will be unnecessary to discuss the other assignments of error."

In Kernodle v. Elder, 23 Okla. 743, 102 P. 138, it was stated in paragraph 1 of the syllabus:

"In an action against a physician for malpractice in the setting and treatment of a fractured limb, where there is no guaranty of cure or contract for extraordinary skill or care, and where the evidence fails to show that the results are not such as usually and ordinarily result in such cases where treated by an ordinarily skillful physician using ordinary care, then there is a failure of proof, and plaintiff is not entitled to recover."

Dealing with a somewhat analogous situation, the Supreme Court of Orgeon said in the case of Doumitt v. Diemer, 23 P. (2d) 918:

"We find no contradiction of this testimony and think the court was warranted in finding that there was no evidence upon which the court or jury could say that the scar, of which plaintiff complained, was the result of the X-ray treatment. The testimony developed that the breaking down of the tubercular glands would itself cause a scar, regardless of the X-ray treatments, and whether this came from the administration of the X-ray treatments or whether it came from the disease of tubercular glands was left wholly to speculation and conjecture.

"In a case where the testimony shows plainly that there are two or more causes, for one of which the defendant is liable and the other he is not, and the matter is left to mere speculation and guess, the case should not be submitted to the jury. Merriam v. Hamilton, 64 Ore. 476, 130 P. 406; Spain v. Oregon-Washington R. & N. Co., 78 Ore. 355, 369, 153 P. 470, 475, Ann. Cas. 1917E. 1104; Lippold v. Kidd, 126 Ore. 160, 169, 269 P. 210, 59 A. L. R. 875. In Mer-

riam v. Hamilton, supra, the rule was announced in a malpractice case, as shown by the syllabus, as follows: 'Where there are two possible causes of an injury, for one of which defendant is not responsible, plaintiff to recover must show that the injury was wholly or partly the result of the cause for which defendant was liable, and, if the evidence leaves it as probable that the injury was the result of one cause as much as the other, he cannot recover.'

"In Spain v. Oregon-Washington R. & N. Co., supra, plaintiff had been thrown in jail at Huntington, Ore. He had had his arm amputated before that, and after his release from jail infection set in, and it was claimed the filthy condition of the jail caused the infection. The testimony developed that it might have come from this cause, but that it might have also come from other causes. The court held: 'When the evidence leaves the case in such a situation that the jury will be required to speculate and guess which of several possible causes occasioned the injury, that part of the case should be withdrawn from their consideration. Armstrong v. Town of Cosmopolis, 32 Wash. 110, 72 P. 1038.'"

In view of the evidence as analyzed and the foregoing authorities applicable to this action, it is my judgment that the trial court erred in denying defendant's motion at the close of the evidence for a directed verdict.